176 N.J. Super. 69 (1980)
422 A.2d 107
IN THE MATTER OF LOVELADIES HARBOR, INC., CONCERNING THE DENIAL OF RIPARIAN PERMIT APPLICATION # 77-0221 AND TYPE B WETLANDS PERMIT APPLICATION # XX-XXXX-X.
LOVELADIES HARBOR, INC. AND LOVELADIES HARBOR UNIT D, INC., APPELLANTS,
v.
DEPARTMENT OF ENVIRONMENTAL PROTECTION, STATE OF NEW JERSEY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued June 9, 1980.
Decided October 27, 1980.
*70 Before Judges BISCHOFF, BOTTER and MORTON I. GREENBERG.
Kevin J. Coakley argued the cause for appellants (Connell, Foley & Geiser, attorneys; Adrian M. Foley, Jr. of counsel).
John M. Van Dalen, Deputy Attorney General, argued the cause for respondent (John J. Degnan, Attorney General, attorney; Stephen Skillman, Assistant Attorney General, of counsel).
The opinion of the court was delivered by BOTTER, J.A.D.
*71 This is an appeal from the denial of two permits sought by appellants for the purpose of filling and dredging approximately 51 acres of land for the development of 108 shore and lagoon front homes. Of the 51 acres approximately 36 are wetlands and 15 are tideland. A type B wetlands permit was sought to satisfy the requirements of N.J.S.A. 13:9A-4(b) which provides: "No regulated activity shall be conducted on any wetland without a permit." "Regulated activity" is defined by subsection (a) of N.J.S.A. 13:9A-4 to include draining, dredging, excavating or depositing any material or erecting any structures or driving pilings or placing other obstructions on wetlands. A waterfront development permit was sought with respect to the 14.8 acres of submerged riparian lands for which a deed had been granted by the State to appellants' predecessors in 1954 and 1956. As stated in appellants' brief, "the riparian permit was needed for the dredging of shore openings for a lagoon system and the filling of bay bottom on the portion of applicants' property below the mean [high] water line." N.J.S.A. 12:5-3 provides that no development or improvement of any "water-front" upon any navigable water or stream shall be commenced without first obtaining approval of the Department of Environmental Protection (DEP).
The waterfront development permit was denied administratively by the Office of Riparian Lands Management of the Division of Marine Services in the DEP. The denial followed a study of the proposed project and an on-site inspection of the area conducted by state and federal representatives. The wetlands permit was denied administratively after a public hearing. The director of the Division found that the application did not meet the standards of N.J.A.C. 7:7A-1.7. A written report accompanied his ruling.
These rulings were then appealed to the Commissioner of DEP, and the appeals were consolidated for a hearing. After taking testimony the hearing officer made findings of fact and *72 conclusions of law and recommended that the denial of the permits be affirmed. This recommendation was adopted in a written decision of the Commissioner of DEP. The Commissioner found that the proposed development did not meet statutory and regulatory standards. He rejected appellants' contention that the denial of the permits constituted an unconstitutional taking of property without compensation, noting that an alternate plan had been proposed by the Director of the Division of Marine Services which would permit development of part of the property for housing. This appeal followed.
The property in question was part of a 250-acre tract acquired by appellants in the late 1950s. Originally the entire tract was undeveloped virgin wetlands except for a portion that was an old railroad bed and that portion which was flowed by the tide. The property was purchased for $300,000. $23,000 was paid to the State for the two riparian grants. Over the years appellants developed 200 acres by dredging and filling and the construction of approximately 375 homes. Some of the homes (approximately 30) front on Barnegat Bay, some (approximately 16) are non-waterfront, and the balance front on a series of lagoons, approximately 15 in number as shown on Exhibit A-5. With one exception these lagoons tie into the "Main Lagoon" which connects with Barnegat Bay, and the remaining lagoon has a direct connection. The property is zoned by Long Beach Township for single-family dwellings with minimum lot sizes of 10,000 square feet. Deed restrictions limit the sale of lots to 10,000 square feet in the minimum and provide that no building shall be built upon any plot having less than 10,000 square feet in area, with one single-family dwelling per lot.
Without doubt the proposed development of the remaining 51 acres of land conflicts with the legislative purpose of preserving wetlands so that they may serve their natural functions. N.J.S.A. 13:9A-1(a) of the Wetlands Act of 1970, N.J.S.A. 13:9A-1 et seq., states:

*73 a. The Legislature hereby finds and declares that one of the most vital and productive areas of our natural world is the so-called `estuarine zone,' that area between the sea and the land; that this area protects the land from the force of the sea, moderates our weather, provides a home for water fowl and for 2/3 of all our fish and shellfish, and assists in absorbing sewage discharge by the rivers of the land; and that in order to promote the public safety, health and welfare, and to protect public and private property, wildlife, marine fisheries and the natural environment, it is necessary to preserve the ecological balance of this area and prevent its further deterioration and destruction by regulating the dredging, filling, removing or otherwise altering or polluting thereof, all to the extent and in the manner provided herein.
The Commissioner properly denied the wetlands permit, and ample credible evidence supports the finding and conclusion that the proposed construction does not meet statutory and regulatory standards. It is immaterial that substantial wetlands exist on other nearby property. Nor is the denial of a permit an unconstitutional taking without compensation. In reaching this conclusion we need not answer the question in the abstract; we need not determine whether the State's interest in preventing a public nuisance, i.e., pollution or destruction of a part of the State's natural environment, can sustain a prohibition against all construction on police power grounds,[1] for in the case at hand the Division suggested a possible alternative plan for development of a portion of the property, approximately 12.5 acres, with 35 single-family houses on separate lots. This substantial potential use of appellants' property precludes appellants' claim of an unconstitutional taking. Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 130-131, 98 S.Ct. 2646, 2663, 57 L.Ed.2d 631, 652-653 (1978); American Dredging Co. v. State, 169 N.J. Super. 18, 20 (App.Div. 1979), aff'g 161 N.J. Super. 504 (Ch. Div. 1978). William Ullman, a principal of appellants who has been involved with the development from the beginning, testified that waterfront lots were currently selling at $45,000 each. Preparation costs were estimated at $6,500 per lot for appellants' original plan. That a more profitable use of the whole *74 property has been denied is no basis for the claim of an unconstitutional taking. As Justice Brennan said in his opinion for the court in the Penn Central case, supra:
`Taking, jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole . ..
........
... the decisions sustaining other land use-regulations, which, like the New York City law, are reasonably related to the promotion of the general welfare, uniformly reject the proposition that diminution in property value, standing alone, can establish a `taking,'....[2] [438 U.S. at 130-132, 98 S.Ct. at 2663-2664, 57 L.Ed.2d at 652-653]
*75 The conclusion we reach makes it unnecessary to consider the Commissioner's suggestion that an alternate development plan would permit the construction of clustered housing that would minimize disturbance of the wetlands. (One alternate plan would allow approximately 70 duplex units, according to testimony, but appellants assert that this would be a less profitable form of development.) However, it appears that deed restrictions limiting use to single family dwellings on separate lots could, as appellants contend, prohibit this creative solution to the conflict between private and public interests. The deed restrictions are not the fault of the State, and the Commissioner viewed the restrictions as a "self-created hardship." Clustered housing may be precluded generally by local zoning, and we need not decide whether such laws must yield to avoid an otherwise unconstitutional taking by permitting some economic use of private property in order to effectuate the State's plan for preservation of a natural asset. The denial of the permits in this case does not preclude appellants from submitting an alternate plan for the property. There is no point in speculating about the future. The property has not been taken from its owners. N.J.S.A. 13:9A-4(a) permits the use of wetlands for the production of salt hay or other agricultural crops. We cannot say that this use will not have substantial value in time. That an alternate plan may be proposed also makes it unnecessary to decide whether the development of 200 acres of the tract is a sufficient answer to appellants' claim of deprivation of property because of the restrictions imposed on the remaining 36 acres of wetlands. See Sibson v. State, 115 N.H. 124, 336 A.2d 239 (Sup.Ct. 1975).
We reject appellants' contention that AMG Associates v. Springfield Tp., 65 N.J. 101 (1974), and Morris Cty. Land Improvem. Co. v. Parsippany-Troy Hills Tp., 40 N.J. 539 (1963), compel the conclusion that appellants' property has been confiscated unconstitutionally because only a portion may be approved for development. Footnote 4 in the AMG Associates case, 65 N.J. at 112-113, sufficiently distinguishes the case at hand from *76 the split-lot zoning type case as well as the undersized lot zoning case as in Harrington Glen, Inc. v. Leonia Bd. of Adj., 52 N.J. 22, 29 (1968). In that footnote Justice Hall, writing for the court, said:
It is to be emphasized that we deal in this case only with the split lot situation where there is a deprivation of all practical use of the smaller portion thereof. The approach to the taking problem, and the result, may be different where vital ecological and environmental considerations of recent cognizance have brought about rather drastic land use restriction in furtherance of a policy designed to protect important public interests wide in scope and territory, as for example, the coastal wetlands act, N.J.S.A. 13:9A-1 et seq., and various kinds of flood plain use regulation. Cases arising in such a context may properly call for a reexamination of some of the statements 10 years ago in the largely locally limited Morris County Land case, supra (40 N.J. 539).
Appellants also contend that N.J.A.C. 7:7A-1.7(a) is invalid because of its purported conflict with the purposes of the Wetlands Act of 1970, particularly N.J.S.A. 13:9A-6. We find no merit to this contention. N.J.S.A. 13:9A-6 provides a procedure for determining if the practical use of one's property has been so restricted as to constitute an unreasonable exercise of the police power and "the equivalent of a taking without compensation." The statute was designed to provide a remedy when such a "taking" has been determined. The legislative purpose was not to determine the "taking" issue. N.J.S.A. 13:9A-4(d) provides that, in granting, denying or limiting any permit for regulated activity as defined in N.J.S.A. 13:9A-4:
... the commissioner shall consider the effect of the proposed work with reference to the public health and welfare, marine fisheries, shell fisheries, wildlife, the protection of life and property from flood, hurricane and other natural disasters, and the public policy set forth in section 1.a. [N.J.S.A. 13:9A-1] of this act.
N.J.A.C. 7:7A-1.7(a)[3] is consistent with these purposes and the express purpose of N.J.S.A. 13:9A-1 to preserve wetlands. *77 Moreover, the provisions of N.J.A.C. 7:7A-1.7(a) are not unduly vague.
The denial of the waterfront development permit pertaining to the 15 acres of riparian lands contained within the 51-acre site must also be upheld, and there are additional reasons for doing so. The riparian grants were received pursuant to law which contained a statutory prohibition against construction without prior approval of the Commissioner. N.J.S.A. 12:5-3 provides that riparian land development of any kind, even for the construction of a dock, wharf, pier, bulkhead, bridge, pipeline or cable, must first be submitted for approval by the DEP. Ample evidence in this case supports the conclusion that the denial of a permit for the filling, dredging and construction as proposed tends to fulfill legitimate state interests and legislative purposes. The State as owner of tidal lands which are "subject to the demands of the public trust doctrine" had the absolute right not to convey its interest in the riparian lands in question in the first instance. LeCompte v. State, 65 N.J. 447, 450-451 (1974). The reservation of the right to control construction or development of tideland contained in N.J.S.A. 12:5-3 may be regarded as legislative and contractual in nature sufficient to prevent a claim for damages by the grantee for the State's refusal to grant a development permit in order to protect the public interest.
Affirmed.
NOTES
[1] See State v. Mundet Cork Corp., 8 N.J. 359, 369-371 (1952), cert. den. 344 U.S. 819, 73 S.Ct. 14, 97 L.Ed. 637 (1952).
[2] The Penn Central case involved New York City's Landmarks Preservation Law. The property owner's arguments rejected there have a parallel in the case at hand. There the court said, further:

... Appellants, moreover, also do not dispute that a showing of diminution in property value would not establish a `taking' if the restriction had been imposed as a result of historic-district legislation, see generally Maher v. New Orleans, 516 F.2d 1051 (CA5 1975), but appellants argue that New York City's regulation of individual landmarks is fundamentally different from zoning or from historic-district legislation because the controls imposed by New York City's law apply only to individuals who own selected properties.
Stated baldly, appellants' position appears to be that the only means of ensuring that selected owners are not singled out to endure financial hardship for no reason is to hold that any restriction imposed on individual landmarks pursuant to the New York City scheme is a `taking' requiring the payment of `just compensation.' Agreement with this argument would, of course, invalidate not just New York City's law, but all comparable landmark legislation in the Nation. We find no merit in it.
It is true, as appellants emphasize, that both historic-district legislation and zoning laws regulate all properties within given physical communities whereas landmark laws apply only to selected parcels. But, contrary to appellants' suggestions, landmark laws are not like discriminatory, or `reverse spot,' zoning: that is, a land-use decision which arbitrarily singles out a particular parcel for different, less favorable treatment than the neighboring ones. See 2 A. Rathkopf, The Law of Zoning and Planning 26-4 and XX-X-XX-X, n. 6 (4th ed. 1978). In contrast to discriminatory zoning, which is the antithesis of land-use control as part of some comprehensive plan, the New York City law embodies a comprehensive plan to preserve structures of historic or aesthetic interest wherever they might be found in the city, and as noted, over 400 landmarks and 31 historic districts have been designated pursuant to this plan. [438 U.S. at 131-132, 98 S.Ct. at 2663, 57 L.Ed.2d at 653]
[3] N.J.A.C. 7:7A-1.7(a) provides:

(a) The Commissioner shall review the filed application and all written information presented by the applicant and others. He shall issue a Type B permit only if he finds that the proposed activity:
1. Requires water access or is water oriented as a central purpose of the basic function of the activity;
2. Has no prudent or feasible alternative on a nonwetland site;
3. Will result in minimum feasible alteration or impairment of natural tidal circulation;
4. Will result in minimum feasible alteration or impairment of the natural contour of the natural vegetation of the wetlands.