593 A.2d 251

MARY GARDNER, INDIVIDUALLY AND MARY GARDNER, EXEC-
UTRIX OF THE ESTATE OF HOBART R. GARDNER, PLAIN-
TIFF–APPELLANT, v. NEW JERSEY PINELANDS COMMIS-
SION, NEW JERSEY DEPARTMENT OF ENVIRONMENTAL
PROTECTION, COMMISSIONER OF ENVIRONMENTAL PRO-
TECTION AND JOHN DOE(S), DEFENDANTS–RESPONDENTS.

Argued October 22, 1990—Decided July 23, 1991.

196

*Patrick F. McAndrew* argued the cause for appellant (*Brandt, Haughey, Penberthy, Lewis & Hyland*, attorneys).

*Mary C. Jacobson*, Deputy Attorney General, argued the cause for respondents (*Robert J. Del Tufo*, Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

HANDLER, J.

The central issue in this case is whether the application of state regulations that limit the use of land in an environmentally-sensitive area constitutes an unconstitutional taking of private property. The regulations strictly limit residential development on such land and require that all remaining undeveloped acreage be subject to a recorded deed restriction limiting it to agriculture and related uses. A farmer contends that the application of this regulatory scheme to his farm effects a partial taking of his property without compensation.

Hobart Gardner lived and worked for almost seventy years on a 217–acre farm that had been owned by his family since 1902. The farm is located in Shamong Township, Burlington County, a part of the pinelands region subject to the regulations. Gardner, now deceased, and his son, who lives on the farm today, cultivated sod and grain. The farm includes a two-family house, barns, and out-buildings.

When confronted with the regulations, Gardner sought compensation, claiming that the land-use restrictions resulted in an unlawful taking of his property. After the State refused payment, Gardner, on February 7, 1988, initiated this action for inverse condemnation against the Commissioner of the Department of Environmental Protection and the New Jersey Pinelands Commission (Commission), which had promulgated the regulations. Gardner also contended that the regulations constituted an unlawful exaction and a denial of equal protection. He did not assert that the Pinelands Protection Act and the

regulations otherwise are unconstitutional or invalid in terms of whether they constitute an impermissible or unreasonable exercise of the police powers in general or the zoning powers specifically. Moreover, the constitutional claims that he did assert are based exclusively on the New Jersey Constitution.

The trial court granted summary judgment for defendants on the claim for inverse condemnation, finding that the overall zoning plan to protect agriculture was a permissible exercise of the State's regulatory power, and, further, that neither the zoning regulation nor the deed restriction was an impermissible taking or exaction. 227 *N.J. Super.* 396, 402–06, 408, 547 *A.*2d 725; (Ch.Div.1988). The court permitted Gardner to advance an equal protection claim by the filing of an amended complaint, *id.* at 409, 547 *A.*2d 725, and subsequently granted summary judgment for defendants on that claim as well. The Appellate Division affirmed the judgments substantially on the basis of the lower court's reasoning. 235 *N.J.Super.* 382, 562 *A.*2d 812 (1989). This Court granted Gardner's petition for certification, 117 *N.J.* 663, 569 *A.*2d 1355 (1989). For ease of understanding, we refer to Gardner as "plaintiff" though his successors-in-interest currently prosecute the case.

I

The value of the unique ecological, economic, and cultural features of the New Jersey Pine Barrens, or Pinelands, has been recognized for decades. *E.g., L.* 1971, *c.* 417 (creating Pinelands Environmental Council; repealed by *L.* 1979, c. 111). Protection of the area, however, did not begin in earnest until Congress enacted the National Parks and Recreation Act of 1978, Pub.L. No. 95–625, 92 Stat. 3492 (codified at 16 *U.S.C.A.* § 471i), establishing over one-million acres as the Pinelands National Reserve. The Pinelands were the first natural resource to be protected by the innovative "national reserve" program. Designed to conserve areas of ecological sensitivity, natural beauty, and cultural importance, the national reserve

concept combines limited public acquisition of property with land-use controls in a cooperative framework involving federal, state, and local governments, as well as concerned private groups and persons. *Senate Energy and Environment Committee Statement,* reprinted at *N.J.S.A.* 13:18A–1 (*Senate Committee Statement*). Governor Byrne promptly issued an Executive Order restricting development in the Pinelands until appropriate state legislation could be enacted. See *Orleans Builders & Developers v. Byrne,* 186 *N.J.Super.* 432, 434–35, 453 *A.2d* 200 (App.Div.1982).

Congress chose the Pinelands as the first protected site with good reason. New Jersey is the most densely populated state in the nation and lies at the midpoint of the emerging megalopolis that extends from Boston to Richmond. *Statistical Abstracts of the United States, 1990* at 21; J. McPhee, *The Pine Barrens* 4–5 (1981). The central corridor of the state between New York and Philadelphia has been described as "one great compression of industrial shapes, industrial sounds, industrial air, and thousands and thousands of houses webbing over the spaces between the factories." J. McPhee, *supra,* at 4. Astride that corridor in central and southern New Jersey is the Pinelands.

The pristine nature of the Pinelands sharply contrasts with its contiguous, dense urban and industrial surroundings. A "wilderness" of pine-oak forests and wild and scenic rivers, the Pinelands harbors a "wide variety of rare, threatened and endangered plant and animal species," and encompasses "many other significant and unique ecological, historical, recreational, and other resources." *Senate Committee Statement, supra;* J. McPhee, *supra,* at 4–5. The region overlies the vast, seventeen-trillion gallon Cohansey aquifer, "one of the largest virtually untapped sources of pure water in the world." *Senate Committee Statement, supra; see* J. McPhee, *supra,* at 13–16. There has been very little development within the Pinelands; there are no major retail centers, and developed property comprises only one to two percent of the land in most areas. New

Jersey Pinelands Commission, *New Jersey Pinelands: Comprehensive Management Plan* 128–29 (1980) (*Comprehensive Management Plan*). Agriculture in the Pinelands, especially the cultivation of cranberries and blueberries, is particularly important both nationally and locally. New Jersey Department of Agriculture, *Annual Report—Ag Statistics* 38, 72–73 (1990).

In recent years, anxiety over the loss of farming and the fragile ecology of the Pinelands has produced increasingly stringent federal and state regulation. Both the federal and the implementing state legislation make clear that conservation, preservation, and protection are the principal ends of governmental regulation of land use in the Pinelands. The federal statute states its purpose is "to protect, preserve and enhance the significant values of the land and water resources of the Pinelands area." 16 *U.S.C.A.* § 471i(b)(1). Similarly, the New Jersey Pinelands Protection Act (Act), *L.* 1979, *c.* 111; *N.J.S.A.* 13:18A–1 to 29, declares that its goals are, among others, to protect, preserve, continue, and expand agriculture and horticulture and to discourage piecemeal and scattered development within the Pinelands. *N.J.S.A.* 13:18A–9b. The Act stresses preservation of the region:

> [T]he continued viability of [the Pinelands] area and resources is threatened by pressures for residential, commercial and industrial development * * * [T]he protection of such area and resources is in the interests of the people of this State and of the Nation * * *.
>
> * * * * * * * *
>
> The Legislature further finds and declares that the current pace of random and uncoordinated development and construction in the pinelands area poses an immediate threat to the resources thereof, especially to the survival of rare, threatened, and endangered plant and animal species and the habitat thereof, and to the maintenance of the existing high quality of surface and ground waters; that such development and construction increase the risk and extent of destruction of life and property which could be caused by the natural cycle of forest fires in this unique area * * *. [*N.J.S.A.* 13:18A–2.]

The Act authorizes the designation of "protection areas" for promotion of agriculture, horticulture, and "appropriate patterns of compatible residential, commercial and industrial development in or adjacent to areas already utilized for such pur-

poses." *N.J.S.A.* 13:18A–9b. It also calls for the establishment of an extensive "preservation area" to protect especially sensitive land in its natural state and to promote compatible agricultural, horticultural, and recreational uses. *N.J.S.A.* 13:18A–9c.

In keeping with the paramount objective of both federal and state governments, *i.e.*, protecting the Pinelands from overdevelopment and consequent ecological degradation, the plan for the Pinelands National Reserve calls for the full participation of federal, state, county, and municipal authorities. 16 *U.S.C.A.* § 471i(b), (d), (f)(4), (g), (h). To ensure that pressures for development do not overwhelm the need for preservation, actions of the lower levels of government that do not conform to that objective can be pre-empted by a higher authority.

The federal statute directs the Governor of New Jersey to create a planning commission. 16 *U.S.C.A.* § 471i(d). The New Jersey Pinelands Commission (the "Commission") is the instrumentality envisaged by federal and state law as having primary responsibility for planning in the Pinelands. *N.J.S.A.* 13:18A–4. Its charge is to develop a "comprehensive management plan" (CMP) to serve as the land-use blueprint for the region, subject to the approval of the federal Secretary of the Interior. 16 *U.S.C.A.* § 471i(d), (f), and (g); *N.J.S.A.* 13:18A–4, –5, –8, –9. To assist the State's efforts, the federal government provides funds for planning and land acquisition, which are subject to repayment if the State does not properly implement a preservation program. 16 *U.S.C.A.* § 471i(g)(5), (g)(6), (k).

A similar system of incentives to cooperate, reinforced by the power to pre-empt, characterizes the relations between the State and local governments under the Act. Initially, the Commission assumed all power to exercise traditional zoning functions within the Pinelands, promulgating minimum land-use standards under the CMP. *N.J.S.A.* 13:18A–8, –10. Thereafter, counties and municipalities were required to conform

their master plans and zoning ordinances to the CMP and to have such plans and ordinances approved by the Commission. *N.J.S.A.* 13:18A–12(a), (b). If a county or municipality fails to conform to the CMP, the Commission will continue to exercise direct control over local land use. *N.J.S.A.* 13:18–12(c).

In developing the CMP, the Commission has been directed to "[r]ecognize existing economic activities within the area and provide for protection and enhancement of such activities as farming, forestry, proprietary recreational facilities, and those indigenous industries and commercial and residential developments which are consistent with such purposes and provisions." *N.J.S.A.* 13:18A–8(d)(3). To those ends, the Commission has been given broad authority to invoke

> a variety of land and water protection and management techniques, including but not limited to, zoning and regulation derived from State and local police powers, development and use standards, permit systems, acquisition of conservation easements and other interest [sic] in land, * * * transfer of development rights, dedication of private lands for recreation or conservation purposes and any other appropriate method of land and water protection and management which will help meet the goals and carry out the policies of the management plan. [*N.J.S.A.* 13:18A–8(d)(1).]

Reflecting the aims of the federal and state statutes, the goals of the CMP include the "continuation and expansion of agricultural and horticultural uses." *N.J.S.A.* 13:18A–9(b)(3). The original CMP, adopted by the Commission in November 1980, stressed that agriculture contributes both to the unique characteristics of the Pinelands and to the environment "by creating open space, terrestrial and aquatic habitats, and wildlife feeding areas." *Comprehensive Management Plan, supra,* at 242. It also stated that suburban development contributes to "an unfavorable economic environment for farmers through escalating taxes, enactment of inhibiting local ordinances, and increased trespassing and vandalism." *Ibid.* Consequently, the original CMP called for several programs to accomplish the objective of agricultural preservation. It identified eight "Pinelands Management Areas" of varying ecological sensitivity, including a Preservation Area District, Forest Ar-

eas, Agricultural Production Areas, and Regional Growth Areas. *N.J.A.C.* 7:50–5.12(a).

The original CMP restricted residential development in Agricultural Production Areas, reserving them primarily for farm and farm-related purposes. Section 5–304 of the plan allowed residential units on lots with 3.2 acres as long as the applicant met certain stringent conditions. The original CMP also permitted ten-acre residential zoning, that is, one residential unit per ten acres, "provided that the dwelling unit is accessory to an active agricultural operation, and is intended for the use of the owners or employees of the agricultural operation."

The Commission further created a development-rights transfer program, under which it would award Pinelands Development Credits (PDCs) to landowners for recording permanent deed restrictions on their property limiting the land to specific uses set forth in the CMP. *See Comprehensive Management Plan, supra,* at 210–12 and sections 5–401 to –407; *N.J.A.C.* 7:50–5.41 to –5.47 (current version). The PDC program seeks to channel development by permitting holders of PDCs to transfer them to owners who wish to increase densities in specially-designated Regional Growth Areas. *N.J.S.A.* 13:18A–31; *N.J.A.C.* 7:50–5.41, –5.45. PDCs may be sold privately at market prices; according to the Assistant Director for Development Review at the Commission, Burlington County has a PDC bank that routinely pays $10,000 per credit. A landowner in an Uplands Agricultural Production Area—the designation that apparently includes the Gardner farm—receives two PDCs per thirty-nine acres. *N.J.A.C.* 7:50–5.43(b)(2)(i).

In the fall of 1987, Gardner explored the possibility of subdividing his property into fourteen to seventeen ten-acre "farmettes" in accordance with the CMP option allowing one farm-related residential unit per ten acres of land. Before the application was submitted, the Commission completed a periodic revision and amendment of the CMP, as required by the Act. *N.J.S.A.* 13:18A–8. The Commission determined, according to

an affidavit submitted by its Assistant Director for Development Review, that the ten-acre farm option had deteriorated into a ten-acre subdivision requirement with no guarantee that the land actually would be used for farming, and had led in some situations "to the cessation of agricultural operations," "effectively eliminating existing agricultural uses, and threatening significant agricultural use of adjoining areas."

The revised CMP permits only three options for residential development of farmland in Agricultural Production Areas: (1) second-generation Pinelands residents or persons whose livelihood depends on traditional Pinelands economic activities may build homes on 3.2–acre lots, *N.J.A.C.* 7:50–5.24(a)(1), –5.32; (2) a home may be constructed on a ten-acre lot for an operator or employee of the farm, but that option may be exercised only once every five years, *N.J.A.C.* 7:50–5.24(a)(2); or (3) homes may be constructed at a density of one unit per forty acres, but only if the residences are clustered on one-acre lots and the remaining thirty-nine acres allocated to each residence are permanently dedicated to agricultural use by a recorded deed restriction, *N.J.A.C.* 7:50–5.24(a)(3), –5.24(c). The restriction of residential development to forty-acre tracts prompted the filing of Gardner's complaint.

## II

Land use regulations span a wide spectrum, from conventional zoning, *e.g., Village of Euclid v. Ambler Realty,* 272 *U.S.* 365, 47 *S.Ct.* 114, 71 *L.Ed.* 303 (1926); *Cobble Close Farm v. Board of Adjustment,* 10 *N.J.* 442, 92 *A.*2d 4 (1952), to particularized restrictions on property with special characteristics, *e.g., Penn Cent. Transp. Co. v. City of New York,* 438 *U.S.* 104, 98 *S.Ct.* 2646, 57 *L.Ed.*2d 631 (1978) (*Penn Central*). The Pinelands Protection Act virtually fills the entire spectrum. It imposes comprehensive and complex regulatory land-use controls over an extensive geographic region with distinctive natural, economic, cultural, and historic characteristics.

■ Because the Pinelands scheme is fundamentally a regime of zoning, takings doctrine dealing with zoning is particularly relevant. In its most general formulation, takings analysis makes two fundamental demands of any zoning scheme: it must substantially advance legitimate state interests, and it cannot deny an owner all economically viable use of the land. *Agins v. Tiburon,* 447 *U.S.* 255, 260, 100 *S.Ct.* 2138, 2141, 65 *L.Ed.*2d 106, 112 (1980). Those demands may become more elaborate when takings analysis is applied to complex, special-purpose regulations. The public purpose of the regulation may consist of the furtherance of a "public function" or the prohibition of particular uses that are inimical to the public welfare. The economic effect of the regulatory scheme can be assessed in terms of the adjustment of economic benefits and burdens or the extent of interference with "distinct investment-backed expectations." *Penn Central, supra,* 438 *U.S.* at 124–28, 98 *S.Ct.* at 2659–61, 57 *L.Ed.*2d at 648–51. Although those standards bear the imprint of federal constitutional doctrine, our own state constitutional principles governing the taking of property are in general conformity. *See Littman v. Gimello,* 115 *N.J.* 154, 161, 557 *A.*2d 314, *cert. denied,* —— *U.S.* ——, 110 *S.Ct.* 324, 107 *L.Ed.*2d 314 (1989); *N.J. Const.* art. I, § 20. Essentially, then, application of takings principles requires a fact-sensitive examination of the regulatory scheme, focusing on whether it substantially advances a legitimate public purpose and whether it excessively interferes with property rights and interests.

A

■ There is not the slightest quarrel that the Act substantially advances several interrelated legitimate and important public purposes. We need refer only to the Legislature's declaration of the Act's objective: to protect the Pinelands, an area providing "a unique habitat for a wide variety of rare, threatened and endangered plant and animal species" and containing "significant and unique * * * resources." Protection of

the Pinelands "is in the interests of the people of this State and of the Nation." *N.J.S.A.* 13:18A–2. The CMP reiterates that purpose, recognizing especially the importance of agriculture because of its capacity to contribute to the special character of the Pinelands and to the environment "by creating open space, terrestrial and aquatic habitats, and wildlife feeding areas," as well as adding "to the cultural, historical, social, visual, and economic characteristics of the Pinelands." *Comprehensive Management Plan, supra,* at 242. That protection of the Pinelands serves the public interest is underscored by the congressional dedication of the region as the Pinelands Natural Reserve. 16 *U.S.C.A.* § 471i.

The preservation of agriculture and farmland constitutes a valid governmental goal. *N.J. Const.* art. VIII, § 1, para. 1(b) (lands used for agriculture or horticulture entitled to favorable tax treatment); *see Boundary Drive Assocs. v. Shrewsbury Township Bd. of Supervisors,* 507 *Pa.* 481, 491 *A.*2d 86 (1985); *cf. City of E. Orange v. Township of Livingston,* 102 *N.J.Super.* 512, 246 *A.*2d 178 (Law Div.1968) (favorable tax treatment under Farmland Assessment Act of 1964, *N.J.S.A.* 54:4–23.1 to –23.23, reserved for actual agricultural use, hence not available to municipal water reserve land used only incidentally for sale of hay, timber and cordwood), *aff'd o.b.,* 54 *N.J.* 96, 253 *A.*2d 546 (1969). The Act and the land-use regulations directly advance agricultural preservation, particularly through the limitation of residential development by large-tract requirements and complementary deed restrictions on undeveloped, nonresidential land. *Cf. Barancik v. County of Marin,* 872 *F.*2d 834, 837 (9th Cir.1988), *cert. denied,* —— *U.S.* ——, 110 *S.Ct.* 242, 107 *L.Ed.*2d 193 (1989) (upholding county plan that restricts housing density to one residence per sixty acres in a valley used for agriculture); *Gisler v. County of Madera,* 38 *Cal.App.*3d 303, 112 *Cal.Rptr.* 919 (Ct.App.1974) (upholding ordinance providing for exclusive agricultural use and prohibiting sales of parcels less than eighteen acres); *Wilson v. County of McHenry,* 92 *Ill.App.*3d 997, 48 *Ill.Dec.* 395, 416 *N.E.*2d 426 (1981)

(upholding 160–acre minimum lot size in agricultural zones); *Codorus Township v. Rodgers*, 89 *Pa.Commw.* 79, 492 *A.*2d 73 (1985) (upholding ordinance prohibiting division of productive farmland into tracts of less than fifty acres).

The Act further advances a valid public purpose by preventing or reducing harm to the public. That is exemplified most dramatically by its measures to safeguard the environment and protect the water supply by severely limiting development. The Legislature specifically determined that "pressures for residential, commercial and industrial development" and the "current pace of random and uncoordinated development" pose an "immediate threat" to a region of vital public importance. *N.J.S.A.* 13:18A–2.

■ The health, safety and morals or general welfare may be promoted by prohibiting certain uses of land. *See Penn Central, supra,* 438 *U.S.* at 125–27, 98 *S.Ct.* at 2659–61, 57 *L.Ed.*2d at 649–50; *see also Keystone Bituminous Coal v. DeBenedictis,* 480 *U.S.* 470, 107 *S.Ct.* 1232, 94 *L.Ed.*2d 472 (1987) (upholding restrictions against removal of coal to prevent mine subsidence); *Goldblatt v. Town of Hempstead,* 369 *U.S.* 590, 82 *S.Ct.* 987, 8 *L.Ed.*2d 130 (1962) (upholding ordinance prohibiting excavation within two feet of groundwater level); *Miller v. Schoene,* 276 *U.S.* 272, 48 *S.Ct.* 246, 72 *L.Ed.* 568 (1928) (upholding destruction of disease-carrying cedar trees to protect apple orchards). The prevention of damage to the environment constitutes a particularly strong justification for prohibiting inimical uses. *E.g., New Jersey Sports & Exposition Auth. v. McCrane,* 61 *N.J.* 1, 63, 292 *A.*2d 545 (1972) (Hall, J., concurring) ("we must also thoroughly respect the balance of nature"); *Texas E. Transmission Corp. v. Wildlife Preserves, Inc.,* 48 *N.J.* 261, 268, 225 *A.*2d 130 (1966) (government conservation of natural resources serves a legitimate public purpose); *Usdin v. Environmental Protection Dep't,* 173 *N.J.Super.* 311, 329, 414 *A.*2d 280 (Law Div.1980) ("No longer are we able to afford the luxury of squandering nature or indiscriminate

over-development \* \* \*."), *aff'd,* 179 *N.J.Super.* 113, 430 *A.*2d 949 (App.Div.1981). A property owner "has no absolute and unlimited right to change the essential natural character of his land so as to use it for a purpose for which it was unsuited in its natural state and which injures the rights of others," *Usdin, supra,* 173 *N.J.Super.* at 327, 414 *A.*2d 280 (citation omitted); *accord Penn Central,, supra,* 438 *U.S.* at 144–45, 98 *S.Ct.* at 2669–70, 57 *L.Ed.*2d at 661–62 (Rehnquist, J., dissenting); *New Jersey Builders Ass'n v. Department of Envtl. Protection,* 169 *N.J.Super.* 76, 96–97, 404 *A.*2d 320 (App.Div.), *certif. denied,* 81 *N.J.* 402, 408 *A.*2d 796 (1979).

That land itself is a diminishing resource cannot be overemphasized. *See Holmdel Builders v. Township of Holmdel,* 121 *N.J.* 550, 565–66, 583 *A.*2d 277 (1990). Environmentally-sensitive land is all the more precious. Hence, a proposed development that may constitute only a small insult to the environment does not lessen the need to avoid such an offense. The cumulative detrimental impact of many small projects can be devastating. *See, e.g., Barancik, supra,* 872 *F.*2d 834; *cf. Gilbert v. State,* 218 *Cal.App.*3d 234, 266 *Cal.Rptr.* 891 (1990) (water connections prohibited to preserve water supply). "If exemptions should be granted because development on individual tracts would impair only minutely the entire resources of the Pinelands, the cumulative effect of such exemptions would defeat the legislative goals of the Pinelands Protection Act." *Orleans Builders & Developers, supra,* 186 *N.J.Super.* at 444, 453 *A.*2d 200; *see Lom–Ran Corp. v. Department of Envtl. Protection,* 163 *N.J.Super.* 376, 388, 394 *A.*2d 1233 (App.Div. 1978).

Plaintiff argues that the regulatory scheme does not fulfill its public purposes in a lawful manner, relying heavily on the Supreme Court's 1987 decision in *Nollan v. California Coastal Commission,* 483 *U.S.* 825, 107 *S.Ct.* 3141, 97 *L.Ed.*2d 677. There, owners of a beachfront property with a small bungalow applied to the California Coastal Commission for a permit to tear down the bungalow and replace it with a much larger

house. Because the larger structure would increase blockage of the ocean view and private use of the shorefront, that Commission conditioned the permit on the owners granting the public a right-of-way easement along the shoreline of their property. *Id.* at 827–29, 107 *S.Ct.* at 3143–44, 97 *L.Ed.*2d at 683–84. The Supreme Court determined first that the easement was tantamount to a permanent physical invasion of the property; hence, had the Commission wished to appropriate a right of way by direct regulation, it would have had to exercise the state's eminent domain power and pay for it. *Id.* at 831–34, 107 *S.Ct.* at 3145–47, 97 *L.Ed.*2d at 686–87. The Court further concluded that preserving visual access to the ocean from the street side of the Nollans' house served a wholly different purpose from creating a right-of-way along the shore, and for that reason the easement was not a reasonable and acceptable exercise of the police powers but a taking of property requiring just compensation. *Id.* at 836–40, 107 *S.Ct.* at 3148–50, 97 *L.Ed.*2d at 688–91.

The restriction in *Nollan* was in the nature of a classic easement or servitude. By authorizing physical access to the beach, it sought to advance a goal collateral to the underlying governmental purpose of preserving visual access to the beach. Here, the underlying regulation limiting residential development on forty-acre tracts restricted predominantly to agriculture directly furthers the central purposes of the Act. The required deed restriction is a constituent part of the regulatory scheme, imposing use limitations substantially identical to the underlying regulation; it does not constitute a burden that is unrelated to the essential purposes of the regulatory scheme. See also, *e.g., Rector of St. Bartholomew's Church v. City of New York,* 914 *F.*2d 348 (2d Cir.1990) (limiting modification or alteration of structures with special historic, architectural or cultural significance substantially advanced by city's landmark preservation scheme), *cert. denied,* —— *U.S.* ——, 111 *S.Ct.* 1103, 113 *L.Ed.*2d 214 (1991); *Glisson v. Alachua County,* 558 *So.*2d 1030 (Fla.Dist.Ct.App.) (development limitations substan-

tially advanced legitimate state interests of protecting environment and preserving historic sites), *review denied,* 570 *So.*2d 1304 (Fla.1990); *Historic Albany Found. v. Coyne,* 159 *A.D.*2d 73, 558 *N.Y.S.*2d 986, 989 (1990) (ordinance requiring authorization for major alterations, demolition, or new construction of buildings in protected historic districts substantially advanced goal of historic preservation); *Orion Corp. v. State,* 109 *Wash.*2d 621, 747 *P.*2d 1062 (1987) (strict development restrictions on least disturbed estuary on Puget Sound substantially advanced environmental preservation goal), *cert. denied,* 486 *U.S.* 1022, 108 S.Ct. 1996, 100 *L.Ed.*2d 227 (1988); *cf. Department of Natural Resources v. Indiana Coal Council, Inc.,* 542 *N.E.*2d 1000, 1007 (Ind.1989) (declaration by Department of Natural Resources that area was unsuitable for surface coal mining because it would damage important historic and cultural systems substantially related to government purpose of preserving heritage of nation and state), *cert. denied,* —— *U.S.* ——, 110 S.Ct. 1130, 107 *L.Ed.*2d 1036 (1990).

We are satisfied that the Act and the regulations implementing it substantially advance legitimate and important governmental objectives.

## B

██ The critical remaining question is whether the regulations impair to an impermissible degree valuable property rights and interests. Diminution of land value itself does not constitute a taking. *E.g., Village of Euclid, supra,* 272 *U.S.* 365, 47 *S.Ct.* 114, 71 *L.Ed.* 303. Similarly, impairment of the marketability of land alone does not effect a taking. *Littman, supra,* 115 *N.J.* at 163, 557 *A.*2d 314; *see Kirby Forest Indus. v. United States,* 467 *U.S.* 1, 15, 104 *S.Ct.* 2187, 2196, 81 *L.Ed.*2d 1, 14 (1984). Also, restrictions on uses do not necessarily result in takings even though they reduce income or profits. *Southern Burlington County NAACP v. Township of Mount Laurel,* 92 *N.J.* 158, 273 n. 34, 456 *A.*2d 390 (1983). A regula-

tory scheme will be upheld unless it denies "all practical use" of property, *Harrington Glen, Inc. v. Municipal Bd. of Adjustment,* 52 *N.J.* 22, 29, 243 *A.*2d 233 (1968); or "substantially destroys the beneficial use of private property," *Schiavone Constr. Co. v. Hackensack Meadowlands Dev. Comm'n,* 98 *N.J.* 258, 263, 486 *A.*2d 330 (1985), or does not allow an "adequate" or "just and reasonable" return on investment, *Holmdel Builders Ass'n, supra,* 121 *N.J.* at 581–82, 583 *A.*2d 277 (citing *Mount Laurel, supra,* 92 *N.J.* at 268, 456 *A.*2d 390); *In re Egg Harbor Assocs.,* 94 *N.J.* 358, 373, 464 *A.*2d 1115 (1983). Significantly, our courts have applied the standard that focuses on the beneficial or economic uses allowed to a property owner in the context of particularized restraints designed to preserve the special status of distinctive property and sensitive environmental regions, such as the Pinelands. *E.g., Egg Harbor Assocs., supra,* 94 *N.J.* 358, 464 *A.*2d 1115 (coastal area); *Spiegle v. Borough of Beach Haven,* 46 *N.J.* 479, 491–92, 218 *A.*2d 129 (1966) (sand dunes), *cert. denied,* 385 *U.S.* 831, 87 *S.Ct.* 63, 17 *L.Ed.*2d 64 (1966); *Orleans Builders & Developers, supra,* 186 *N.J.Super.* 432, 453 *A.*2d 200 (pinelands); *In re Loveladies Harbor, Inc.,* 176 *N.J.Super.* 69, 73–75, 422 *A.*2d 107 (App.Div.1980) (wetlands) *certif. denied,* 85 *N.J.* 501, 427 *A.*2d 588 (1981); *New Jersey Builders Ass'n, supra,* 169 *N.J. Super.* at 96–97, 404 *A.*2d 320 (pinelands); *Toms River Assocs. v. Department of Envtl. Protection,* 140 *N.J.Super.* 135, 355 *A.*2d 679 (App.Div.) (coastal area), *certif. denied,* 71 *N.J.* 345, 364 *A.*2d 1077 (1976); *Sands Point Harbor, Inc. v. Sullivan,* 136 *N.J.Super.* 436, 346 *A.*2d 612 (App.Div.1975) (coastal wetlands); *see also Glisson, supra,* 558 *So.*2d 1030 (upholding restrictions that reflected type of ecology present and sought to protect environment and preserve historic area).

 Plaintiff acknowledges that preserving agriculture is a legitimate governmental objective that can be achieved through land-use regulation. He contends, nonetheless, that the land-use regulations, including the required deed restrictions of the revised CMP, interfere to an intolerable degree with his right

and freedom to use and enjoy his farmland property. The response to that contention is found in *Penn Central, supra,* 438 *U.S.* 104, 98 *S.Ct.* at 2649, 57 *L.Ed.*2d 631, which amplified the takings principles applicable to specialized regulations seeking to preserve the status of distinctive property.

In *Penn Central,* New York City had enacted a landmarks preservation ordinance, requiring approval from the Landmarks Preservation Commission for exterior alterations. *Id.* at 109–12, 98 *S.Ct.* at 2651–54, 57 *L.Ed.*2d at 639–42. Owners of affected buildings could transfer development rights from a landmark parcel to proximate lots. *Id.* at 113–14, 98 *S.Ct.* at 2654–55, 57 *L.Ed.*2d at 642. Penn Central sued when that Commission refused to approve construction of a multi-story building atop Grand Central Terminal, a designated landmark. *Id.* at 116–19, 98 *S.Ct.* at 2655–57, 57 *L.Ed.*2d at 643–45. It contended that New York had "taken" its air space and that the law had both significantly diminished the value of the site as a whole and unfairly singled out people who owned landmark properties to bear the public burden. *Id.* at 130–35, 98 S.Ct. at 2662–65, 57 *L.Ed.*2d at 652–55. The Supreme Court rejected those arguments. It explained that takings jurisprudence focused on the nature and extent of interference with rights in the whole parcel, not discrete segments; that when laws are reasonably related to the general welfare even severe diminution in value will not effect a taking if viable uses remain; and that, far from being discriminatory, the law embodied a comprehensive plan to preserve structures of historic and aesthetic interest throughout the city. *Id.* at 129–35, 98 *S.Ct.* at 2661–65, 57 *L.Ed.*2d at 651–55. Moreover, Penn Central could continue to use the parcel in a gainful fashion and could offset its loss by transferring valuable development rights to other parcels, even though such transfers did not fully compensate it. *Id.* at 137, 98 *S.Ct.* 2666, 57 *L.Ed.*2d at 656–57.

Plaintiff's claim fails under the *Penn Central* analysis. The CMP does not change or prohibit an existing use of the land when applied to plaintiff's farm. *See id.* at 129, 98 *S.Ct.* at

2661, 57 *L.Ed.*2d at 651–52. Like Penn Central, plaintiff may continue the existing, admittedly beneficial use of the property. Further, although whether Penn Central could again make use of all of its property, particularly the airspace over its terminal, was unclear, plaintiff may gainfully use all of his property, including the right to build five homes clustered together on the restricted land. There also is no showing that the economic impact of the regulations interferes with distinct investment-backed expectations. In addition, Penn Central could offset its loss by transferring valuable property rights to other properties, even if such transfers did not fully compensate it. Plaintiff possesses the similar right to offsetting benefits; it may receive Pinelands Development Credits in return for recording the deed restrictions. Finally, there is no invidious or arbitrary unfairness in the application of the regulatory scheme. Gardner's neighbors in Uplands Agricultural Areas are burdened by exactly the same restrictions, and other landowners in the Pinelands must abide by comparable regulations as part of an integrated comprehensive plan designed to benefit both the region and the public. *See Agins, supra,* 447 *U.S.* at 262, 100 *S.Ct.* at 2142, 65 *L.Ed.*2d at 113; *cf. Penn Central, supra,* 438 *U.S.* at 138–53, 98 *S.Ct.* at 2666–74, 57 *L.Ed.*2d at 657–66 (Rehnquist, J., dissenting) (New York scheme singled out specific individual properties and did not impose uniform restrictions).

Plaintiff also cites *Morris County Land Improvement Co. v. Parsippany–Troy Hills Township,* 40 *N.J.* 539, 193 *A.*2d 232 (1963) (*Morris County Land*), to support his contention that preservation zoning can constitute a taking if it interferes too greatly with the landowner's use of its property. *Morris County Land* held that a zoning ordinance that maintained an entire swamp area in its natural state, permitting use only for raising fish and aquatic plants and as a flood water detention basin, constituted a taking because the landowner had been deprived of "any worthwhile rights or benefits in the land." *Id.* at 555–56, 193 *A.*2d 232. We find *Morris County Land* inappo-

site. Plaintiff does not deny that the uses allowed under the Act and the CMP are "worthwhile rights or benefits in the land." In contrast to the permitted uses in *Morris County Land*, agriculture in the pinelands region is an existing, indeed a longstanding, endeavor that is economically supported locally and nationally. Moreover, the vitality of *Morris County Land* has declined with the emerging priority accorded to the ecological integrity of the environment. The decision, now nearly thirty years old, arose in a time before the environmental and social harms of indiscriminate and excessive development were widely understood or acknowledged. That the same facts would occasion the same result today is by no means certain. *See AMG Assocs. v. Township of Springfield*, 65 *N.J.* 101, 112 n. 4, 319 *A.*2d 705 (1974). Indeed, many more recent decisions have overtly or tacitly failed to follow *Morris County Land* in environmental contexts. *E.g.*, *Loveladies Harbor, Inc., supra*, 176 *N.J.Super.* 69, 422 *A.*2d 107; *Usdin, supra*, 173 *N.J.Super.* 311, 414 *A.*2d 280; *New Jersey Builders Ass'n, supra*, 169 *N.J.Super.* 76, 404 *A.*2d 320; *Toms River Assocs., supra*, 140 *N.J.Super.* 135, 355 *A.*2d 679; *Sands Point Harbor, Inc., supra*, 136 *N.J.Super.* 436, 346 *A.*2d 612. For example, in *American Dredging Co. v. State*, 161 *N.J. Super.* 504, 391 *A.*2d 1265 (Ch.Div.1978), *aff'd*, 169 *N.J.Super.* 18, 404 *A.*2d 42 (App. Div.1979), the Department of Environmental Protection, acting pursuant to the Wetlands Act of 1970, *N.J.S.A.* 13:9A–1 to –10, issued an order prohibiting the plaintiff from placing dredged material on a portion of its land. The court distinguished *Morris County Land* by explaining, "Where the effect of the governmental prohibition against use is not in furtherance of a governmental activity, such as flood control or preservation of land for a park or recreational area, but rather to preserve the land for ecological reasons in its natural environment without change, the consideration of the reasonableness of the exercise of the police power must be redetermined." *Id.* 161 *N.J.Super.* at 509, 391 *A.*2d 1265.

Plaintiff further argues, based on *Nollan,* that the imposition of a deed restriction itself is tantamount to the taking of an interest in property that requires just compensation. Acknowledging that the deed restriction and the regulations impose substantially identical limitations on the use of his land, plaintiff nevertheless contends that the restrictive covenant imposes an added burden; it is "permanent," while the regulations are not.

The regulations are not for a limited period of time; they may endure indefinitely, and, in view of the public stake in the ecological integrity of the Pinelands, there is no likelihood that this regulatory scheme will end in the foreseeable future. Further, any difference in the market value of the property based on the potential longevity of the deed restriction, in contrast to the duration of the regulations, is purely conjectural and unmeasurable. In any event, if the underlying regulations were changed or were to predecease the deed restrictions, that would seriously undermine the validity and enforceability of the deed restrictions. More importantly, the restrictive covenant differs from the *Nollan* easement because it does not impair plaintiff's right to exclude others from his land, arguably a more fundamental element of the bundle of property rights than even the freedom to use property as desired. *Compare Nollan, supra,* 483 *U.S.* 825, 107 *S.Ct.* 3141, 97 *L.Ed.*2d 677 (finding a taking when right to exclude impaired), and *Kaiser Aetna v. United States,* 444 *U.S.* 164, 179–80, 100 *S.Ct.* 383, 392–93, 62 *L.Ed.*2d 332, 346 (1979) (same) *with Agins, supra,* 447 *U.S.* at 262, 100 *S.Ct.* at 2142, 65 *L.Ed.*2d at 113 (no taking by restrictive zoning scheme that entailed no physical invasion of property) and *Penn Central, supra,* 438 *U.S.* 104, 98 *S.Ct.* 2646, 57 *L.Ed.*2d 631 (same).

In sum, plaintiff retains several viable, economically-beneficial uses of his land under the revised CMP. That those uses do not equal the former maximum value of the land in a less- or un-regulated state is not dispositive, for there exists no constitutional right to the most profitable use of property. We

conclude that the restriction on lands to farmland and related uses, given the distinctive and special characteristics of the Pinelands, does not deprive plaintiff of the economic or beneficial use of all or most of his property, sufficiently diminish the value or profitability of his land, or otherwise interfere with his ownership interest to constitute a taking of property without just compensation.

## III

Plaintiff contends that the regulations constitute a form of illegal "exaction," in effect requiring Pinelands farmers to pay the costs of zoning benefits for the public at large. He relies on a line of cases addressing the imposition of subdivision exactions, particularly *Longridge Builders v. Planning Board*, 52 *N.J.* 348, 245 *A*.2d 336 (1968). That case held that a municipality could not require, as a condition of subdivision approval, a developer to pave a dedicated off-site right-of-way from the proposed subdivision to an existing road. The Court explained that a developer "could be compelled to bear [only] that portion of the cost bearing a rational nexus to, and benefits conferred upon, the subdivision. It would be impermissible to saddle the developer with the full cost where other property owners receive a special benefit from the improvement." *Id.* at 350, 245 *A*.2d 336; *see also Holmdel Builders Ass'n, supra,* 121 *N.J.* at 571, 583 *A*.2d 277 (traditionally strong, causal nexus between off-site public facilities and private development required to justify exactions).

Plaintiff's reliance on *Longridge Builders* is misplaced. On a conceptual level, applying the nexus requirement that governs responsibility for off-site improvements in connection with a single private development to a comprehensive environmental protection scheme that limits the use of land is difficult, if not impossible. *Cf. Holmdel Builders Ass'n, supra,* 121 *N.J.* at 572, 583 *A*.2d 277 (refusing to apply strict rational nexus standard to affordable-housing development fees because there

was sound basis to support legislative judgment that reasonable relationship exists between unrestrained nonresidential development and need for such housing). Moreover, in the exactions cases, the development constitutes a lawful, permitted use; in that situation, the critical issue is the validity of imposing on the permissible development the costs for off-site improvements or for overcoming burdens occasioned by the development. In contrast, regulations that lawfully impose land-use constraints on an ecologically-sensitive area can validly disallow the development itself. If, in that context, the developer could not claim that the regulation effects an unlawful taking, it cannot claim that it constitutes an unlawful exaction.

Furthermore, unlike exactions for off-site improvements that unfairly or disproportionately penalize a developer and benefit the general public, the uniform land-use restrictions in the CMP are part of a comprehensive scheme. The CMP creates eight areas within the vast Pinelands region, prescribing different landuses according to the environmental, ecological, economic, and cultural characteristics of the respective areas. The CMP distributes and allocates the economic burdens among all property owners in order to promote the public good. *Cf. Agins, supra,* 447 *U.S.* at 262, 100 *S.Ct.* at 2142, 65 *L.Ed.*2d at 113 (takings case); *Penn Central, supra,* 438 *U.S.* at 139–40, 98 *S.Ct.* at 2666–67, 57 *L.Ed.*2d at 657–58 (Rehnquist, J., dissenting) (same). Thus, plaintiff and his neighbors within the Uplands Agricultural Production Area are subject to identical development restrictions; that the impact of such a broad scheme may affect particular property differently does not impugn the scheme. *Cf. Penn Central, supra,* 438 *U.S.* at 124–28, 133–35, 98 *S.Ct.* at 2659–61, 57 *L.Ed.*2d at 648–50, 654–55. Plaintiff and his neighbors, as well as the general public, also share the benefits from the preservation of the natural environment and the protection of the water supply. *Cf. Agins, supra,* 447 *U.S.* at 262, 100 *S.Ct.* at 2142, 65 *L.Ed.*2d at 113 (sharing benefits of open space).

Plaintiff further relies on *Grand Land Co. v. Township of Bethlehem*, 196 *N.J.Super.* 547, 483 *A.*2d 818 (App.Div.1984), *certif. denied*, 101 *N.J.* 253, 501 *A.*2d 925 (1985), to argue that the deed restrictions are invalid. That case involved a municipality that rezoned land from industrial to agricultural and nonintensive uses and which permitted residential subdivisions on 1.5–acre tracts as long as corresponding 25–acre tracts remained in agricultural use. The court found that the scheme exceeded the municipality's zoning authority under the Municipal Land Use Law because it sought to compel an involuntary reservation of land for a public purpose. 196 *N.J.Super.* at 552, 483 *A.*2d 818.

We find *Grand Land* inapposite. The zoning authority is part of the police power; that power "enables a municipality to take such actions 'as it may deem necessary and proper for the good government, order and protection of persons and property, and for the preservation of the public health, safety and welfare of the municipality and its inhabitants.' " *Holmdel Builders Ass'n, supra*, 121 *N.J.* at 568, 583 *A.*2d 277 (quoting *N.J.S.A.* 40:48–2). That a regulation provides an indirect benefit to others does not place it beyond the police power. *Id.* at 572–73, 583 *A.*2d 277 (zoning regulation conferring off-site benefit on those needing affordable housing falls within municipality's zoning and police powers); *see Miller, supra*, 276 *U.S.* 272, 48 *S.Ct.* 246, 72 *L.Ed.* 568; *Roe v. Kervick*, 42 *N.J.* 191, 199 *A.*2d 834 (1964). Moreover, as emphasized *supra* at 207–209, 593 *A.*2d at 258–259, the Act seeks to prevent harm to the public by preventing environmental degradation. As we stated in *Lusardi v. Curtis Point Property Owners Ass'n*, 86 *N.J.* 217, 229 n. 3, 430 *A.*2d 881 (1981), "This policy of preserving the environment * * * is properly effectuated through the zoning power." The Act and the CMP impose a comprehensive regional land-use scheme, of which the deed restriction is one element, applicable to lands in Agricultural Production Areas. Its purposes and effects must be viewed not simply in terms of whether certain lands are held for agricultural use in order to

preserve open space for the indirect benefit or aesthetic enjoyment of others; the scheme must be understood in terms of its intertwined public purposes of maintaining agriculture as a needed economic activity and safeguarding the natural environment and a critical water supply, together with the documented need to arrest incompatible development. Because the zoning authority and the CMP both derive from and fall within the police power, *Grand Land* does not control the present case.

 Plaintiff finally contends that the CMP deprives him of equal protection of the law under the New Jersey Constitution because he is subject to more severe restrictions and receives less benefits than farmers participating in the easement program under the Right to Farm Act, *N.J.S.A.* 4:1C–1 to –10, and the Agriculture Retention and Development Act, *N.J.S.A.* 4:1C–11 to –48. Those acts created the State Agricultural Development Committee (SADC), see *N.J.S.A.* 4:1C–4, and authorized it, in cooperation with county agriculture development boards, to buy development easements restricting land to agricultural uses, *N.J.S.A.* 4:1C–5, –8, –24. The program is completely voluntary on both sides; the State does not exercise its eminent domain power, nor must it buy the easement if a farmer wishes to sell. Although the SADC may purchase easements on farmland throughout the state, the value of the easement necessarily is limited by the use the owner otherwise could make of the land and therefore depends in large part on applicable land-use restrictions. *N.J.S.A.* 4:1C–31c.

Although the phrase "equal protection" does not appear in the New Jersey Constitution, this Court has recognized that article I, paragraph 1 of the state constitution protects against " 'the unequal treatment of those who should be treated alike.' " *Barone v. Department of Human Servs.*, 107 *N.J.* 355, 367, 526 *A.*2d 1055 (1987) (quoting *Greenberg v. Kimmelman*, 99 *N.J.* 552, 568, 494 *A.*2d 294 (1985)). Equal protection analysis under that provision rejects the multi-tiered analysis of federal equal protection doctrine and instead employs a bal-

ancing test. *Brown v. City of Newark,* 113 *N.J.* 565, 573, 552 *A.*2d 125 (1989). " 'In striking the balance, we have considered the nature of the affected right, the extent to which the government restriction intrudes upon it, and the public need for the restriction.' " *Id.* at 573–74, 552 *A.*2d 125 (quoting *Greenberg, supra,* 99 *N.J.* at 567, 494 *A.*2d 294).

The revised CMP does not deny plaintiff equal protection of the laws. Plaintiff does not contend that he belongs to a suspect or semi-suspect class. The right at issue here also is not a fundamental right because it involves only plaintiff's ability to use his property in the most profitable or economically-valuable manner, not the right to derive some beneficial use of the property. *See supra* at 210–216, 593 *A.*2d 259–262; *Mount Laurel, supra,* 92 *N.J.* at 273 n. 34, 456 *A.*2d 390 (1983) (zoning does not require that land be used for maximum profitability); *Rexon v. Board of Adjustment,* 10 *N.J.* 1, 8, 89 *A.*2d 233 (1952). Moreover, the fragile ecology, historic and cultural significance, and natural beauty of the Pinelands all contribute to the unique nature of the region and justify its special treatment. Plaintiff also, at minimum, has a right to PDCs. Thus, we hold that the restrictions in Agricultural Production Areas in the CMP do not violate plaintiff's right to equal protection under the state constitution.

### IV

The judgment below is affirmed.

STEIN, J., concurring.

I concur with the Court's judgment that the regulations enacted pursuant to the Pinelands Protection Act, *N.J.S.A.* 13:18A–1 to –29, do not effect a taking of plaintiff's property. As noted by the Court, *ante* at 197–198, 593 *A.*2d at 253, plaintiff did not challenge those regulations on substantive-due-process grounds. I write separately in order to emphasize the distinction between the issue resolved by the Court and the issues we do not decide.

A landowner challenging a zoning regulation as a violation of substantive due process must overcome the presumption of validity and demonstrate that the scheme is arbitrary, capricious, or unreasonable, and therefore an invalid exercise of the public authority's police power. *See Schmidt v. Board of Adjustment*, 9 *N.J.* 405, 414, 88 *A.*2d 607 (1952). In *Goldblatt v. Town of Hempstead*, 369 *U.S.* 590, 82 *S.Ct.* 987, 8 *L.Ed.*2d 130 (1962), the Supreme Court reiterated the substantive-due-process test, stating that a land-use regulation is a valid exercise of the police power if " 'the interests of the public * * * require such interference[ ] and * * * the means are reasonably necessary for the accomplishment of the public purpose[ ] and not unduly oppressive upon individuals.' " *Id.* at 595, 82 *S.Ct.* at 990, 8 *L.Ed.*2d at 134 (quoting *Lawton v. Steele*, 152 *U.S.* 133, 137, 14 *S.Ct.* 499, 501, 38 *L.Ed.* 385, 388 (1894)). On the other hand, a zoning scheme effects a taking if the regulations either do not substantially advance legitimate state interests or deny an owner all beneficial use of his or her land. *Agins v. City of Tiburon*, 447 *U.S.* 255, 260, 100 *S.Ct.* 2138, 2141, 65 *L.Ed.*2d 106, 112 (1980). *But cf. Nollan v. California Coastal Comm'n*, 483 *U.S.* 825, 843–44 n. 1, 107 *S.Ct.* 3141, 3146 n. 1, 97 *L.Ed.*2d 677, 693–94 n. 1 (1987) (Brennan, J., dissenting) (contending that standard for reviewing threshhold issue of validity of public body's exercise of police power is same in either "takings" or "due-process" analysis).

Although the constitutional requirement that an exercise of the police power may not be unreasonable, arbitrary, or capricious has remained the same, the criteria for making that determination are not static. Rather, they vary "with changing needs and conditions pertaining to the public health, safety, morals, or general welfare." *Schmidt v. Board of Adjustment, supra,* 9 *N.J.* at 414–15, 88 *A.*2d 607. Whatever may constitute the public interest underlying a police-power regulation, however, a public body may not arbitrarily discriminate between persons similarly situated. *Id.* at 418, 88 *A.*2d 607; *see*

*also Penn Cent. Transp. Co. v. City of New York*, 438 *U.S.* 104, 133 n. 29, 98 *S.Ct.* 2646, 2664 n. 29, 57 *L.Ed.*2d 631, 654 n. 29 (1978) (challenge that zoning ordinance is arbitrary or discriminatory should include consideration of treatment of similar parcels); *Nectow v. City of Cambridge*, 277 *U.S.* 183, 48 *S.Ct.* 447, 72 *L.Ed.* 842 (1928) (Court considered surrounding property in determining whether zoning was substantially related to public health, morals, safety, or welfare).

The deed restriction required by the regulations as a condition of an owner's right to develop property consistent with the Pinelands regulatory scheme is indeed unique. In effect, it operates as a mandate that farmland property be used for farmland in perpetuity, even if the underlying zoning has changed. The Court expresses its concern about the enforceability of the restriction in the event of a zoning change. *Ante* at 214–216, 593 *A.*2d at 262.

Although the Court concludes that the regulatory scheme requiring plaintiff to deed-restrict his land in order to develop five residential lots does not effect a taking, that holding is not conclusive on the issue whether the New Jersey Pinelands Commission's regulations violate principles of substantive due process. Resolution of that issue would involve a determination, based on a plenary hearing, whether plaintiff is being treated unfairly or discriminatorily, considering various factors including the need for the restrictions, other available methods of attaining the State's public purpose, and the treatment of similarly-situated parcels. *Cf. Schmidt v. Board of Adjustment, supra*, 9 *N.J.* at 416, 88 *A.*2d 607 ("Restraints upon property cannot be unreasonable or unduly discriminatory * * * [or] go[ ] beyond the public need.").

Justice STEIN concurs in the result.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN—6.

*Opposed*—None.