CRABTREE, J.T.C.
These are consolidated local property tax cases wherein plaintiff seeks direct review of the 1990 assessments on its property located on the south side of New Jersey State Highway Route 3, near the New Jersey Turnpike, in East Rutherford, New Jersey. Plaintiff also seeks review of a judgment of the Bergen County Board of Taxation affirming the 1990 assessment on a parcel constituting part of the same property.
The assessments, all pertaining to land only, were as follows:
*403 Block/Lot Acreage Assessment
108B/18 10 $ 2,000,000
108B/26BD 34 7.680.000
146 8.031.000 109/1
15.1 800,300 109/6
6.5 344.500 109/7
3.5 185.500 109/8
3.0 137,800 109/9
22.5 799,000 109/10
240.6 $19,978,100
At issue are the true value of the subject property and whether plaintiff is entitled to relief from a discriminatory assessment pursuant to N.J.S.A. 54:51A-6 (chapter 123). More specific, the primary issue is the impact on value of restrictions on wetlands development imposed by the Clean Water Act, 33 U.S.C.A. § 1251 et seq. and regulations thereunder promulgated by the United States Environmental Protection Agency (USEPA).
The overall plot is irregular in shape and is divided by Berry’s Creek Canal, which extends from Berry’s Creek on the west to the Hackensack River. The land north of the canal contains 44 acres, while the land south of the canal contains 196.6 acres. There is no road access to the land south of the canal. Access to the portion north of the canal is provided by the service road which parallels Route 3.
Approximately four acres of the subject property are uplands, 3.75 acres being located in one parcel adjoining the service road, the balance of the upland acreage is found in small, scattered parcels. The remaining 236.6 acres are wetlands.
Wetlands are defined in USEPA regulations as “areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation *404 typically adapted for life in saturated soil conditions.” 40 C.F.R. § 230.41(a).
Dr. Joseph A. Maser, called as an expert in wetlands delineation and verification, testified as to the scientific criteria employed in defining an area as wetlands. Those criteria are the presence of hydrophidic vegetation (plants adapted to growing in wet or inundated conditions), hydric soils (soils with characteristics of being inundated periodically or permanently saturated), and hydrology (inundation from surface water or ground water rising into the area). Maser’s written report indicated the satisfaction of all three criteria in the area of the subject property which he characterized as wetlands. He found the presence of hydrophidic vegetation in highly dense stands of phragmites (common reed), smooth cordgrass, saltmeadow cord-grass, spike rush and other plants growing in wet conditions. The on-site field investigations conducted by Maser and his associates, together with soil samples taken from the shore of Berry’s Creek Canal and from the tidal marsh area south of the canal confirmed the presence of hydric soils. Maser also confirmed the presence of hydrology.
In addition, Maser consulted the National Wetlands Inventory Map and the USEPA AVID[1] map, both of which identify virtually the entire area as wetlands.
Finally, in delineating and verifying the wetlands area of the subject, Maser followed the procedures prescribed in the Federal Manual for Identifying and Delineating Jurisdictional Wetlands (the manual), which was published in January 1989. Those procedures included the three-part test described by Maser.
Section 404 of the Clean Water Act, 33 U.S.C.A. § 1344, authorizes the United States Corps of Engineers (USACOE) to *405 issue permits for the discharge of dredged or fill material into the navigable waters of the United States. Permits are issued pursuant to guidelines adopted by USEPA, which also has a veto power over permits to be issued by USACOE. 33 U.S.C.A. § 1344(c). The term “navigable waters” as used in § 404 means waters of the United States. 33 U.S.C.A. § 1362(7). USEPA regulations include wetlands among waters of the United States. 40 C.F.R. § 230.3(s)(7).
Where property was characterized by saturated soil and aquatic vegetation, the property was wetlands and USACOE and USEPA had jurisdiction over it under the Clean Water Act. United States v. Ciampitti, 615 F.Supp. 116 (D.N.J.1984), aff’d, 772 F.2d 893 (3 Cir.1985), cert. den., 475 U.S. 1014, 106 S.Ct. 1192, 89 L.Ed.2d 307 (1986).
The subject property is in the meadowlands and therefore development is under the jurisdiction of the Hackensack Meadowlands Development Commission (HMDC), which preempts municipal zoning and planning. N.J.S.A. 13:17-ll(b). The property lies within the Berry’s Creek Center District (BCC) and the Parkside Residential District (PR), both areas delineated by the HMDC for development in accordance with specified uses. Berry’s Creek Center District contemplates the following mixed use development:
1. Commercial Development
2. Office Facilities
3. Residential Development
4. Cultural Facilities
5. Transportation Systems
6. Open Space
7. Marshland Open Area
8. Physical and Mental Health Care Facilities
9. Group Day Care Centers
10. Centers and Halls for Community Meetings and Activities
11. Public Schools
12. Library Development
13. Public Improvements and Utilities
*406 The PR districts require inclusion of the same uses as the BCC district, except for office facilities and marshland open area. In addition, PR development must include a wetland strip.
Dredging and filling of wetlands is indispensable to both BCC development and PR development.
The USEPA has promulgated guidelines pursuant to § 404(e)(1) of the Clean Water Act regarding the issuance of permits to dredge and fill wetlands. One of these guidelines, 40 C.F.R. § 230.10(a), declares that no discharge of dredged or fill material will be permitted if there is a practicable alternative which would have less impact on the aquatic ecosystem. Practicable alternatives are presumed (1) to be available and (2) to have a less adverse impact on the aquatic ecosystem. 40 C.F.R. § 230.10(a)(3).
The credible testimony of Maser and Dennis Toft, an attorney, both experts in the § 404 permitting process, indicates that USACOE and USEPA viewed the subject property as one of the last remaining large tracts of wetlands in the meadowlands and they were concerned that the wetlands be preserved in their pristine state. As a result USACOE, applying the practicable alternatives test strictly, would take a dim view of an application to dredge or fill the subject tract for any sort of development.
Moreover, the use of contiguous uplands as mitigation for filled wetlands {i.e., flooding the uplands and creating wetlands to compensate for the filled wetlands) would not be acceptable to USACOE because of the habitat value of the uplands, i.e., their use as nesting grounds for the marsh hawk, an endangered species.
The resolve of USACOE and USEPA to deny § 404 permits was stiffened by a 1988 decision of the United States Court of Appeals for the Second Circuit, Bersani v. Robichaud, 850 F.2d 36 (2 Cir.1988), aff’g, 674 F.Supp. 405 (N.D.N.Y.1987), where *407 the court held that the practicable alternatives test of USEPA regulations must be satisfied at the time the applicant acquires the property, not when a § 404 permit application is filed with USACOE, by which time all eligible upland sites may have been taken. This strict view was evidenced by USACOE’s refusal to grant a § 404 permit to the New Jersey Turnpike Authority, which needed fill to construct a new turnpike interchange at exit 16W.
Toft, who represented the Turnpike Authority in its permit application, testified that, subsequent to Bersani, USACOE adopted a much stricter approach to the permit process and, in his view, signalled the business and regulatory communities that USACOE would not allow the development of tidelands properties.
In the period 1985 to October 1, 1989, USACOE granted no permits within the meadowlands for commercial development. In all that time only four permits were issued. Three of these were issued to HMDC for nature center projects; the fourth permit was issued to Belle Meade Corporation for an after-the-fact application to fill 3.25 acres. Six other applications were filed and withdrawn in the same period.
Both Maser and Toft testified that the permit process for the subject property could take up to five years and would involve expert fees and professional fees running into millions of dollars.
Thomas Marturano, Director of Solid Waste and Engineering for HMDC, testified as to his involvement in, and familiarity with, the development of “specially planned” areas, which are large tracts of open, vacant land in the meadowlands. The subject property is one of those areas. He told of his participation in the formulation of a special area master plan (SAMP), the product of joint efforts and agreement among HMDC, USACOE, USEPA and New Jersey Department of Environmental Protection (DEP). Participants in the SAMP study agreed *408 that future applications to dredge and fill wetlands in conformity with HMDC’s zoning regulations would not be required to satisfy the strictly construed practicable alternatives test. An environmental impact statement (EIS) was required before SAMP could be implemented. Marturano stated completion of the EIS was projected for March 1992. He went on to observe that the SAMP study participants expected SAMP to be finalized shortly after the completion of the EIS. As he put it, “We expect to have some answers in 1992.”
Plaintiff’s valuation expert, utilizing the sales comparison approach, estimated the true value of the subject property to be $300,000 an acre for the four acres of uplands, $6,000 an acre for the 40 acres of wetlands north of Berry’s Creek Canal and $3,000 an acre for the 196.6 acres of wetlands south of the canal. Thus, his aggregate true value estimate was $2,029,800, composed as follows:
Block/Lot Acres Value/Acre Total Value
108B/18 10 $ 6,000 $ 60,000
108B/26BD
Upland 4 300,000 1,200,000
Wetland 30 6,000 180,000
109/1 146 3.000 438,000
109/6 15.1 3.000 45,300
109/7 6.5 3.000 19.500
109/8 3.5 3.000 10.500
109/9 3.0 3.000 9,000
109/10 22.5 3.000 67.500
$2,029,800
In arriving at a value estimate of $300,000 an acre for the four acres of uplands, he relied upon four sales, two in nearby Secaucus and two in defendant taxing district. The details on those sales are as follows:
*409 Sale # 1 Sale # 2 Sale # 3 Sale #4
Address: Penhorn Rd. & Seventh Street, Secaucus Paterson Plan Rd., East Rutherford Meadowland Parkway, Secaucus Route 20 & Murray Parkway, East Rutherford
Sale date 6/1/87 4/3/86 9/24/85 5/14/85
Sale price $991,500 $500,000 $1,110,000 $2,500,000
Size (acres) 4.34 2.41 3.816 13.518
Price per acre $228,456 $208,333 $290,880 $184,938
Sale # 1 Sale #2 Sale # 3 Sale #4
Adjustments:
Time 19% 33% 39% 44%
Time adjusted price/acre $271,863 $277,083 $404,323 $266,310
Location —0— -0--0--0-
Size 0 -5% 0 10%
Zoning -10% -10% -10% -10%
Net Adjustment Adjusted -10% -15% -10% 0
price/acre $244,676 $235,520 ¡,891 6,310
The expert’s time adjustment was predicated on an assumed annual increase in real estate values of 12% annually through the end of 1988 and a levelling off of such values throughout 1989. No adjustments were made for location as all the comparable sale properties, like the subject, were within the HMDC area. Minor size adjustments were made in two of the sales on the premise that size is inversely proportional to unit price, i.e., the larger the lot the lower the unit price. The expert made negative zoning adjustments for all four sales because of the more restrictive requirements imposed by HMDC for the BCC district.
In arriving at true value estimates of $6,000 an acre and $3,000 an acre for wetlands acreage, the expert relied upon seven vacant land sales, only two of which were in the meadow-lands. Both of those sales involved land in East Rutherford. The details on those seven are as follows:
*410 Sale Sale Sale Lot Size No. Location Date Price (Acres) Acre
5 West Valley Brook Rd. 1/5/90 $ 30,000 8.0 $ 3,750 Washington Twp.
6 Moosepac Road, Jefferson Tp. 9/28/89 $ 55,000 14.54 $ 3,782
7 100 Morris Ave., Denville 6/8/89 $ 30,000 13.65 $ 2,197
8 Paterson Plank Rd. & E/S N.J. Tpke., E. Rutherford 9/22/88 $ 50,000 13.4 $ 3,731
9 W/S Big Piece Rd., Fairfield 12/11/87 $ 15,000 9.6 $ 1,563
10 Marginal Rd., Fairfield 12/17/86 $ 7,000 3.19 $ 2,194
11 Rear of Horseneck Rd., 12/12/86 Fairfield 5,000 4.25 $ 1,176
12 N.J. Tpke., East Rutherford 9/4/84 $132,000 8.6 $15,272
Adjustments
Sale No. Time Time Adj. Price/Acre Location Size Zoning Net Adi. Adj. Price/Acre
5 -0- $ 3,750 25% -10% -10% 5% $ 3,938
6 —0— 3,782 25% -10% -10% 5% 3,971
7 -0-2,197 25% -10% -10% 5% 2,307
8 3% 3,843 -0--10% -10% -20% 3,074
9 12% 1,751 15% -10% -5% -0-1,751
10 24% 2,721 15% -10% -5% -0-2,721
11 25% 1,470 ■15% -10% -5% -0-1,460
12 52% 23,213 -0--10% _0_ -10% 20,892
Sale # 5 involved a landlocked parcel sold without approvals for development. Sale # 6 also involved a landlocked parcel; 85% of the land was under water. Sale # 7 involved land in a flood hazard area that is low and wet. Sale #9 was of wetlands property. Sale # 10 is located in a flood zone; it was purchased for wild life use. Sale # 11 involved wetlands purchased and donated to Fairfield in connection with a building constructed elsewhere. This appears to be a mitigation exchange as a condition precedent to the issuance of a § 404 fill *411 permit. Finally, the property involved in sale # 12 was located between Route 3 and Paterson Plank Road and it abuts the Hackensack River. The sale property is zoned for marshland preservation.
The expert concluded that the highest and best use of the uplands acreage with service road frontage was for development pursuant to HMDC zoning. The highest and best use of the balance of the subject property was for conservation.
Defendant’s assessor was qualified as its valuation expert. He estimated the true value of the subject property to be $47,500,000 on the assessing date. In arriving at this conclusion he relied upon four vacant land sales, all of them involving upland property. The details on those sales are as follows:
Address: Sale # 1 N/E Corner Wash. Ave. & Commerce Blvd., Carlstadt Sale # 2 Orchard St., E. Rutherford Sale # 3 Industrial Rd., Carlstadt Sale #4 Two Bridges & Sands Rd., Fairfield
Sale date 7/31/89 12/1/89 7/19/89 2/5/91
(Contract)
Sale price $1,364,000 $11,497,000 $980,000 $8,000,000
Size (acres) 3.1 12.95 1.83 12.5
Price/Acre $440,000 $888,000 $535,500 $640,000
Sale # 1 was a condemnation by the New Jersey Commissioner of Transportation in connection with a Washington Avenue widening project. The properties involved in sales # 2 and # 3 were completely filled uplands with development approval prior to sale. Sale # 4 was contingent on planning board and DEP approvals.
The expert adjusted all sales for location, topography, size, regulatory constraints and zoning. The location adjustments *412 for sales # 1 and # 3 were 50% and 100%, respectively. In arriving at a true value for uplands, defendant’s expert simply added the adjusted sale prices and divided by four. He went on to make adjustments, apparently, for wetlands acreage.
The expert concluded the highest and best use was the mixed-use development contemplated by HMDC zoning. He regarded the property, as he put it, to be “ideal for vertical development by major players.”
The court will first deal with the valuation evidence of defendant’s' valuation expert.
The expert’s evidence is flawed in too many respects to have any probative value. To begin with, his so-called comparable sales are not even remotely comparable. Sale # 1, for example, was a condemnation and severance damages were part of the award. The expert did not know how much was paid for the land and how much for severance damages. Second, sales # 2 and # 3 involved completely filled uplands with governmental approvals issued prior to each sale. Third, sale # 4 was still in the contract stage and conditioned on planning board and DEP approvals. Fourth, sale # 3 was adjusted 100% for location, an adjustment which casts serious doubt on its comparability. Fifth, three of the four sales were of uplands; only two acres of the 12.95 acres involved in sale # 4 were wetlands. These sales simply do not admit of reasonable comparison to the subject so as to provide credible evidence of the latter’s value. Venino v. Carlstadt, 1 N.J.Tax 172 (Tax Ct.1980) aff’d o.b. per curiam, 4 N.J.Tax 528 (App.Div.1981). Finally, the expert averaged the adjusted sales prices of his comparables to arrive at a value for a portion of the subject. This averaging technique is a departure from sound appraisal principles; it is not an acceptable valuation technique. Wedgewood Knolls v. West Paterson, 11 N.J.Tax 514 (Tax Ct.1991).
The most significant shortcoming of the expert’s presentation is the lack of any record support for his wetlands valuation. The probative value of an expert’s opinion depends entirely upon the facts and reasoning offered in support of it. Kearny *413 Leasing Corp. v. Kearny, 6 N.J.Tax 363 (Tax Ct.1984), aff’d o.b. per curiam, 7 N.J.Tax 665 (App.Div.1985); Evid.R. 56, comment 7 (Anno.1983).
Accordingly, as stated above, the valuation evidence of defendant’s expert has no probative value and the court thus rejects it.
The valuation evidence of plaintiff’s expert must be analyzed in the context of the severe developmental restraints—indeed the prohibitions—imposed by federal regulatory agencies. The record makes it abundantly clear that dredge and fill permits under § 404 of the Clean Water Act for wetlands development are virtually impossible to obtain from USECOE and USEPA. The resistance of those agencies to the issuance of § 404 dredge or fill permits for wetlands is fortified by the practicable alternative test of USEPA regulations and the heavy burden imposed by those regulations upon applicants for such permits to show the absence of a practicable alternative that does less damage to the aquatic ecosystem. The agencies’ position is undergirded even further by the restrictive judicial interpretation in the Bersani case that the existence of a practicable alternative must be determined at the time of the applicant’s acquisition of the wetland property, not when the application for a dredge or fill permit is filed.
It is well settled that governmental restrictions may affect the value of real property for property tax purposes. Zoning regulations affect value, State v. Gorga, 26 N.J. 113, 138 A.2d 833 (1958); State v. Wildlife Preserves, 134 N.J.Super. 287, 340 A.2d 665 (App.Div.1975); Sage v. Bernards Tp., 5 N.J.Tax 52 (Tax Ct.1982); so do pinelands development controls, Riorano v. Weymouth Tp., 4 N.J.Tax 550 (Tax Ct.1982), aff’d o. b. per curiam, 6 N.J.Tax 253 (App.Div.1983); sewage disposal requirements, West Orange v. Goldman’s Estate, 2 N.J.Tax 582 (Tax Ct.1981); and, of course, legislation restricting the transfer of environmentally contaminated property, Inmar Associates, Inc. v. Carlstadt Boro., 112 N.J. 593, 549 A.2d 38 (1988). See generally Schwam v. Cedar Grove Tp., 9 N.J.Tax 406 (Tax *414 Ct.1987), aff’d, 228 N.J.Super. 522, 550 A.2d 502 (App.Div.1988), certif. den., 115 N.J. 76, 556 A.2d 1219 (1989).
Defendant’s argument that the subject wetlands should be valued as though the restraints imposed by USECOE and USEPA did not exist, given the probable implementation of SAMP and the ensuing subordination of Federal regulatory controls to HMDC zoning, is without merit. The credible testimony of defendant’s own witness Marturano, impels the conclusion that on the assessing date of October 1, 1989, the SAMP program was little more than a gleam in a regulator’s eye.
Post-assessing date events are probative of true value on the assessing date only if they either corroborate preassessing date facts or are reasonably foreseeable on the assessing date. Fort Lee v. Invesco Holding Corp., 3 N.J.Tax 332 (Tax Ct.1981), remanded on other grounds, 6 N.J.Tax 255 (App.Div.1983), certif. den., 94 N.J. 606, 468 A.2d 238 (1983); Inwood at Great Notch v. Little Falls Tp., 6 N.J.Tax 316 (Tax Ct.1984).[2] The evidence in this case leaves no doubt that neither the time nor the extent of SAMP implementation was predictable on the assessing date, especially in view of the need for an environmental impact statement (EIS) and the risk that the EIS would reach conclusions inimical to implementation of SAMP. Moreover, the public hearings to be conducted regarding SAMP/EIS would provide an opportunity for environmental groups to marshall opposition to any surrender by USACOE and USEPA of their controls over wetlands development.
The evidence of plaintiff’s valuation expert provides credible support for his conclusions of value. His upland value estimate of $300,000 an acre reflects the absence of regulatory restraints *415 on the four-acre parcel[3] and the latter’s highest and best use for development along the Route 3 service road frontage. His four comparable upland sales are all in the meadowlands, three of them are of comparable size and the largest adjustment for all the sales is for time.
Accordingly, the court finds the true value of the four-acre upland parcel to be $300,000 an acre or $1,200,000.
Similarly, the expert’s comparable sales of wetlands disclose, among other things, two properties zoned for marshland preservation, a property to be used as a wildlife refuge, a property purchased and donated to the Town of Fairfield as wetlands by way of mitigation for a building constructed elsewhere, presumably on filled land, landlocked[4] underwater parcels and land in a flood hazard area. His distinction between wetlands north of Berry’s Creek Canal with highway access which he valued at $6,000 an acre, and wetlands south of the canal, which had no such access, which he value at $3,000 an acre, is supported by his comparable sales of landlocked properties and properties which are not landlocked.
Accordingly, I find that the true value of the wetlands north of Berry’s Creek Canal to be $6,000 an acre or $240,000 for 40 acres and the true value of the remaining 196.6 acres to be $3,000 an acre or $589,800.
Defendant urges, however, that the subject property should be valued on the basis of all the interests therein, including the owner’s right to compensation for the loss of value resulting from regulatory restrictions on use, i.e., inverse condemnation. By this ingenious, imaginative argument defen *416 dant would have this court disregard the effect of regulatory controls on value on the theory that the principle of inverse condemnation makes up the difference between the lessened value attributable to those controls and the value the property would possess if those controls were removed.
In the view the court takes of defendant’s argument it is not necessary to determine the connection, if any there be, between a claim for compensation as a result of inverse condemnation and the value of property for local property tax purposes. There has been no taking of property which entitles the owner to compensation.
While the use of property is always subject to some governmental regulation, if regulation goes too far it will be recognized as a taking, for which the owner is entitled to compensation. Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). For example, where a county ordinance prohibited reconstruction of any building in a designated flood protection area, that ordinance deprived the owner of all use of its property, either temporarily or permanently, and that deprivation was a taking, with respect to which the owner was entitled to just compensation under the 5th and 14th Amendments to the United State Constitution. First English Evangelical Lutheran Church v. Los Angeles County, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987).
The United States Supreme Court has also held that regulation under the Clean Water Act can be a taking of property requiring the payment of just compensation to the owner if its effect on the owner’s ability to put his property to productive use is sufficiently severe. United States v. Riverside Bayview Homes, Inc., 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). The New Jersey Supreme Court adheres to the same principle, holding that a compensable taking can occur when governmental action substantially destroys the beneficial use of private property. Schiavone Const. Co. v. HMDC, 98 N.J. 258, 263, 486 A.2d 330 (1985). Restrictions on land use short of total appropriation, if sufficiently extensive and pro *417 longed may constitute a taking. Ibid.; Lomarch Corp. v. Mayor of Englewood, 51 N.J. 108, 237 A.2d 881 (1968).
Diminution of land value alone, however, does not constitute a taking. Gardner v. New Jersey Pinelands Commission, 125 N.J. 193, 210, 593 A.2d 251 (1991); Littman v. Gimello, 115 N.J. 154, 163, 557 A.2d 314 (1989). By the same token a denial of the most profitable use of a piece of property is not an appropriate basis for an inverse condemnation claim where a substantial potential use for the property remains. In re Loveladies Harbor, Inc., 176 N.J.Super. 69, 73-74, 422 A.2d 107 (App.Div.1980). In Loveladies the court held that a denial of permits for dredging and filling wetlands and tidelands did not constitute a taking because the regulatory agency involved suggested an alternative plan for the development of the owner’s property.
In Florida Rock Industries, Inc. v. United States, 791 F.2d 893 (Fed.Cir.1986), cert. den., 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987), the court held that, if a “solid and adequate” fair market value were found to exist which the owner could obtain from others “that would be a sufficient remaining use of the property to forestall a determination that a taking had occurred or that any just compensation had to be paid by the government.” 791 F.2d at 903.
In this case the only credible evidence of the value of the wetlands portion of the subject property is that of plaintiff’s valuation expert. That evidence indicates a “solid and adequate” fair market value notwithstanding the regulatory restrictions against development imposed by the Clean Water Act, as administered and interpreted by USACOE and USEPA.
The general average ratio for defendant taxing district for tax year 1990, duly promulgated by the Director, Division of Taxation pursuant to N.J.S.A. 54:1-35.1, was 48.10%. The true values of the subject parcels as herein found are less than the assessments. Plaintiff is therefore entitled to discrimination relief by virtue of N.J.S.A. 54:51A-6(b), which provides that, whenever the assessment exceeds the property’s true value as *418 found by this court, the assessment shall be reduced by applying the general ratio to the true value.
Accordingly, I direct the Acting Clerk of the Tax Court to enter judgment showing the assessments to be as follows:
BIock/Lot Assessment
108B/18 $ 28,900
108B/26BD 663,800
109/1 210,700
109/6 21,800
109/7 9,400
109/8 5,100
109/9 4,300
109/10 32,500

AVID is an acronym for advance identification of wetlands and is a process conducted by USEPA, Fish & Wildlife Service, the U.S. Army Corps of Engineers (USACOE) and the New Jersey Department of Environmental Protection (DEP) to identify areas in the Hackensack Meadowlands that are wetlands.

The principle stated in the text does not apply to a post-assessing date sale of the subject property. Glen Wall Associates v. Wall Tp., 99 N.J. 265, 283, 491 A.2d 1247 (1985).

The habitat value referred to in the opinion pertains to other, smaller upland parcels, which plaintiffs expert has treated as wetlands.

Although it is not entirely clear, plaintiffs expert does not appear to use the term "landlocked” in its technical legal sense, i.e., a parcel lacking frontage on a public highway but enjoying access to a highway as a matter of law. See Double MK Farm v. Frelinghuysen Tp., 11 N.J.Tax 6, 10-11 (Tax Ct.1990). He seems to use the term as meaning a lack of physical access.