SMALL, J.T.C.
The court in this case is called on to determine the proper assessment for Block 108.A, Lots 27, 28, 29, and 32.A for the tax years 1991,1992, 1993, and 1994. Based on the evidence presented at trial the Court must address three fundamental issues:
1. Whether three AM radio broadcast towers should be classified as real or personal property under N.J.S.A 54:4r-l, as amended by “The Business Retention Act”, L.1992, c. 24, § 3, and if real property, what is their value;
*513 2. Whether the subject property includes wetlands, and if so, how many acres of wetlands are included in this 22.58 acre parcel;
3. How should this uniquely zoned land and improvements be valued?
a. What is its highest and best use?
b. Should wetlands and uplands be valued separately?
c. What are comparable properties to the subject?
d. What adjustments need to be made to the comparables in order to value the subject?
e. If the highest and best use is for development beyond its current use, should the value of the improvements be added to the value of the land or should they be disregarded?
For the reasons expressed below, I have determined that:
1. The concrete bases on which the radio towers sit are assessable as real property. The towers are not subject to local property tax.
2. Six and one-third acres of the 22.58 acre parcel are wetlands.
3. The total fair market value of the subject property on each of the four assessing dates was $6,027,300.
I.
For the years in question the property was assessed as follows:
1991 and 1992
Land $ 5,211,000
Improvements $ 1,632,000
Total $ 6,843,000
1993 and 1994
Land $17,999,800
Improvements $ 4,510,000
Total $22,509,800
For 1991 the Chapter 123 ratio (N.J.S.A. 54:51A-6) was 53.97%. For 1992 the Chapter 123 ratio was 66.69%. 1993 was a revaluation year and thus the Chapter 123 ratio does not apply. For 1994 the Director’s Chapter 123 ratio exceeded 100%.
*514 II.
The property is 22.58 acres and is located in the Hackensack Meadowlands. It is bordered by the New Jersey Turnpike, Rt. 3, Rt. 120 (previously known as Rt. 20), and service roads within the Sports Complex. Specifically, it sits in a corner of the area zoned Sports Complex Zone within the Hackensack Meadowlands. It is the only piece of privately held property that has been so zoned since the creation of the Hackensack Meadowlands Development Commission. See N.J.AC. 19:4-4.121 to -4.123. It is bordered principally by the New Jersey Turnpike and the New Jersey Sports and Exposition Authority controlled land which contains Giants Stadium, the Brendan Byrne Arena, and the Meadowlands Racetrack. It is improved by a 4000 square foot brick building which contains various broadcast equipment and three 500 foot AM radio broadcast towers.
The parties have stipulated to the following values for the improvements to the real property:
For each of the four years 1991 to 1994, the building was worth $150,000 and the three towers were worth $1,100,000. Plaintiff maintains that the towers in their entirety are personal property under the applicable law and the municipality maintains that they are real property in their entirety. Nevertheless, should the court find that they may be assessed as partially real property for valuation purposes, the parties have agreed that the three piers, the piles and concrete part of the structures, were worth $440,000 and the three steel structures were worth $660,000. The plaintiffs position is that the value of land in the Meadowlands decreased during the four years which are the subject of this litigation. The defendant’s expert opined that values were stable during that period. Nevertheless, the parties have agreed that the total value of all of the improvements was the same for the four years that are before this court.
*515 A.

The Radio Towers

The radio towers were described by the engineer of radio station WEVD as sitting on triangular concrete bases which are approximately 45 feet in length on each side. With regard to the concrete bases, Mr. Cheval, the general contractor and the builder of the concrete bases (piers) on which the radio towers were erected testified as to their construction. I find his testimony to be uncontroverted. Accordingly, I make the following findings of fact: Each pier consists of three sets of ten wood piles which are driven approximately 60 to 70 feet into the ground. The wood piles are covered with creosote to retard rotting. The piles have approximately 6 to 8 inch tips and are 14 inches at their head. Thus, each of the three piers consists of thirty piles driven 60-70 feet into the ground. On top of each set of ten piles there is a pile cap made of poured concrete which includes approximately one foot of the pile within it. On top of the pile caps there are grade beams which are made of poured concrete. Within each grade beam there are three inch in diameter, 9 foot long anchor bolts. The steel superstructure is attached to the anchor bolts. Mr. Cheval recollected that it cost approximately $250,000 in 1969 and 1970 to construct the piers; to build comparable piers today would cost approximately one million dollars.
The towers themselves are triangular, approximately 35 feet in length on each side at the base, and tapered to approximately 2$ to 3 feet at the top. The towers are constructed of L-shaped and tubular pieces of steel which are bolted together. It is possible to disassemble and reassemble towers such as these at another place. In fact, it is occasionally done. The radio station’s chief engineer, Mr. Levites, testified that in general, if the towers were disassembled and reassembled, new hardware, i.e., nuts, bolts, and washers, would be used, but the steel members would be the same. He described the structure as something like a child’s erector set. He described in detail the way the towers function in terms of broadcasting radio signals. There is no separate antenna, neither a dish mounted on the tower nor a wire or antenna independent *516 from the tower. Each tower, and all of its members, actually radiate the AM signal. The towers are designed so that they work specifically for the radio frequency of their user, radio station WEVD, broadcasting at 1050 cycles. The engineer also testified that if the towers were unbolted and moved neither the towers nor the piers would be injured.
The radio signal is a “directional” signal which is required by the FCC so that it does not interfere with other stations broadcasting at the same or similar frequencies. Mr. Levites indicated that the radio broadcast signal is originated in New York City at the studios of station WEVD and transmitted by cable to the building in East Rutherford and further transmitted by means of underground cable to each of the three towers from whence it is broadcast over the AM radio frequency of 1050.
Mr. Levites testified that the radiation of waves, a physical phenomenon, flows from every surface of the tower and is measurable. He also testified that there were no moving parts to the towers in connection with the radiation of the broadcast signal. He testified that the height of the tower was almost one-half wavelength of the 1050 kilohertz frequency of radio station WEVD. Since Mr. Levites’ testimony was uncontroverted, I adopt as findings of fact his description of the towers and them function.
The towers in this case were erected in 1968[1] and have been used by WEVD since at least 1989. They had been in continuous use for 20-plus years prior to the tax appeals which are the subject of this litigation. There was no direct testimony on the subject of the intent of owners of broadcast towers. There was testimony that the towers could be moved. Nevertheless, I have concluded based on the testimony in this case and my reading of the New Jersey eases dealing with the taxation of radio broadcast towers that it is the general intent of the owners and users of *517 radio broadcast towers, that they be maintained in the single fixed location at which they are originally constructed.
Two separate Appellate Division panels have determined that radio broadcast antenna towers are subject to local property taxation and are to be classified as real property within the meaning of N.J.S.A 54:4-1. NYT Cable TV v. Audubon, 230 N.J.Super. 530, 553 A.2d 1368 (App.Div.), certif. denied, 117 N.J. 646, 569 A.2d 1344; (1989), Westinghouse Broadcasting Inc., v. Director, Div. of Taxation, 141 N.J.Super. 301, 358 A.2d 203 (App.Div.1976).
Both of those eases were decided before the enactment of the Business Retention Act, L.1992, c. 24. There are minor differences in the physical description of the towers in this ease and those in the two Appellate Division cases. In N.Y.T. Cable TV, supra, the steel towers supported dish antennas; here the towers are the antennas; in Westinghouse it is not clear whether the towers supported the antennas or were the antennas.
Were I to determine the taxability of the radio towers based on the law prior to the enactment of The Business Retention Act, L.1992, c. 24, codified at N.J.S.A 54:4-lb and N.J.S.A 54:4-1.12 to -1.16, I would be compelled to find that the subject towers in this case are legally indistinguishable from the towers in those two cases. The determination in those cases would control my determinations in this case. The 1992 changes in the law result in a different determination.
The Business Retention Act amended N.J.S.A. 54:4-1 to read as follows:
Real property taxable under this chapter means all land and improvements thereon and includes personal property affixed to the real property or an appurtenance thereto, unless:
a. (1) The personal property so affixed can be removed or severed without material injury to the real property;
(2) The personal property so affixed can be removed or severed without material injury to the personal property itself; and
(3) The personal property so affixed is not ordinarily intended to be affixed permanently to real property; or
*518 b. The personal property so affixed is machinery, apparatus, or equipment used or held for use in business and is neither a structure nor machinery, apparatus or equipment the primary purpose of which is to enable a structure to support, shelter, contain, enclose or house persons, or property. For purposes of this subsection, real property shall include pipe racks, and piping and electrical wiring up to the point of connections with the machinery apparatus, or equipment of a production process as defined in this section.
[emphasis added]
The legislative intent of this act was stated in the Committee Statement to S'.332 as follows:
Senate Bill 332, “The Business Retention Act”, amends the description of locally taxable property to reaffirm the Legislature's regularly stated position of excluding machinery, apparatus and equipment used err held for use in business from local taxation.
To reject and reverse the classification of property and narrowing of business property exclusions accomplished by a series of recent New Jersey Tax Court decisions, including Texas Eastern v. Div. of Taxation, 11 N.J.Tax 198 (1990); Am. Hydro Power Partners v. Clifton, 11 N.J.Tax 12 (1990); and Badische Corporation v. Town of Kearny, 11 N.J.Tax 385 (1990). The bill amends subsection (b) of R.S. 54:4-1 to specify that items of machinery, apparatus or equipment used in the conduct of a business are defined as personal property regardless of the class or type of real property to which such items may be affixed. Such items are defined as locally taxable real properly only if they constitute a structure, as defined in the bill, or are primarily used to enable a structure to support, shelter, contain, enclose, or house persons or property. Examples of machinery, apparatus or equipment which enable a structure to house persons or property, and which are therefore locally taxable, include central heating or air conditioning systems, elevators, suspended ceilings, of fixed partitions, plumbing and plumbing fixtures connected to a plumbing system, overhead lighting, sprinkler systems, piping and electrical wiring up to the point of connection with a manufacturing process within the structure, and a central hot water system or the boiler primarily used to supply it.
However, the bill provides that the machinery, apparatus or equipment of a petroleum refinery directly used for refining crude oil into petroleum products is taxable by local taxing districts. Equipment used for such other purposes as chemical or petrochemical manufacturing is not included in the locally taxable property even if it is located on the grounds of a petroleum refinery.
[emphasis added]
The legislature specifically enacted and codified its expression of legislative intent at N.J.S.A 54:4-1.14:
The Legislature, therefore, declares that it is the policy of the State, through this Act, to refine the definitions of real property and personal property in order to reaffirm the broad exclusion from local property taxes of business personal property used or held for me in business.
[Emphasis added]
Further, N.J.S.A 54:4-1.15, enacted as part of The Business Retention Act, defines other terms as follows:
*519 “Structure” means any assemblage of building or construction materials fixed in place for the primary purpose of supporting, sheltering, containing, enclosing or housing persons or property.
“Machinery, apparatus or equipment” means any machine, device, mechanism, instrument, tool, tank or item of tangible personal property used or held for use in business.
“Used or held for use in business” means any item of machinery, apparatus or equipment used or held for use in a business transaction, activity, or occupation conducted for profit in New Jersey.
As noted above, the towers themselves are not used for the purpose of supporting an antenna, as was the tower in NYT Cable TV v. Audubon, supra The towers are, in fact, the antenna. Therefore, I find that within the meaning of N.J.S.A 54:4^1.15, the towers are machinery, apparatus, or equipment.
The dictionary definition of machinery, apparatus, and equipment discussed by this court in Taylor v. Lower Tp., 13 N.J.Tax 371, 379-80 (Tax 1993) and the Director of the Division of Taxation’s regulation which defines the term “machinery apparatus or equipment” to mean
any machine, device, mechanism, instrument, tool, tank or item of tangible personal property used or held for use in business [and to] also include[ ] machinery, apparatus or equipment directly used in the production of [sic] sale of ... telecommunication services
[N.J.A.C. 18:12-10.1]
leave no doubt that the antennas are covered by the definition of tax-exempt machinery, apparatus, and equipment found in N.J.S.A. 54:4-l(b).
I further find that because they were used to broadcast the radio signal of radio station WEVD they “were used or held for use in business.” In addition, since they do not “support, shelter, contain, enclose or house, persons or property,” and they are in fact, machinery, apparatus, or equipment, they constitute neither a “structure” within the meaning of N.J.S. A 54:4r-1.15, nor “machinery, apparatus or equipment the primary purpose of which is to enable a structure to support, shelter, contain, enclose or house persons or property” within the meaning of N.J.S.A 54:4-l(b).
*520 In NYT Cable, supra, this court and the Appellate Division determined that the entire radio tower, both concrete foundation and steel structure were to be taxed as real property. The taxpayer had argued that the towers and their bases should be treated separately. The Appellate Division found “no pressing need to enter this thicket and resolve that question here.” 230 N.J.Super. at 535, 553 A2d 1368.
In this case I find that the antenna are machinery, apparatus, and equipment. The concrete bases are not. The concrete bases are permanently affixed to the land and cannot be removed without material injury to themselves. Unlike the tower antennas they cannot be disassembled and moved. Like the tower antennas they are generally intended to be maintained where they are built. Unlike the antennas, their function is only to support the tower antennas. Thus, the bases become taxable as real property. The tower antennas actually radiate the radio broadcast signal. The tower antennas are attached to the bases. They would be taxable as real property but for the fact that they are machinery, apparatus, and equipment. This ease requires us to get into the thicket avoided by the Appellate Division in NYT Cable TV, but the statute gives us an easy road map out of that thicket.
The concrete bases on which the steel towers sit are either improvements or “structures” because they are “fixed in place” and “support” the steel towers. The towers themselves are machinery, apparatus, and equipment, physically and functionally distinguishable from the bases.
This finding should be distinguished from that of this Court in Taylor v. Lower Tp., supra, 13 N.J.Tax 371, where this eourt found floating docks were not machinery, apparatus, or equipment used or held for use in business within the meaning of N.J.S.A 54:4-l(b) and the Director’s interpretive regulations at N.J.AC. 18:12-10.1 and N.JAC. 18:24-4.2. It should be noted also that in R.C. Maxwell v. Galloway Tp., 13 N.J.Tax 519 (Tax 1993), aff'd, — N. J.Tax-(1995), petition for certif. filed (May 15, 1995) (appeal No. 40,409) this court found that billboards were not machinery, apparatus, or equipment within the meaning of The *521 Business Retention Act. Both of these decisions, finding the floating docks and the billboards not covered by The Business Retention Act, dealt with “structures” factually distinguishable from the radio towers (as opposed to the concrete bases) in their physical purpose and use.
In Taylor v. Lower Tp., supra, this court found that docks and piers were permanently affixed to the land and intended to be so affixed, thus excluding them from the protection from taxation provided by N.J.S.A 54:4-l(a). After reciting the definition of machinery, apparatus, and equipment, the court concluded that “there is simply no evidence before the court that the docks and the piers 'fit any of the definitions given.” 13 N.J.Tax at 380. Thus, the court concluded that they failed the test specified in N.J.S.A 54:4-l(b). To the contrary, in this case, I find that the antennas meet those tests. Radio broadcasting is a business, the antennas are an essential part of that business, and they are used in the regular course of the business. The antennas are scientifically constructed and used to broadcast radio waves at a specific frequency to communicate WEVD’s radio broadcast and commercial messages to its listening audience. The docks and piers are simpler, more passive structures. Although they may contain or support wiring, piping, and other utilities they are functionally distinguishable from the wave transmitting antennas.
In R.C. Maxwell Co. v. Galloway Tp., supra, 13 N.J.Tax at 529, this court found that billboards were not exempt from local property tax by virtue of N.J.S.A 54:4H(b) and The Business Retention Act because they were “structures” — within the meaning of N.J.S.A 54:5-1.15. The primary purpose of the billboard was to support property (advertising copy). The antennas in this case support nothing — they transmit waves.
The towers fit within the definition of machinery, apparatus, or equipment and are not subject to the local property tax on real property. Thus, I do not need to analyze the towers according to the test under N.J.S.A 54:4-l(a) used in the prior two Appellate Division decisions dealing with radio towers. Were I to do so, I would find that it was the intention of the owners or builders to *522 have these towers permanently affixed to the land, as did the Appellate Division in the two prior cases.
One final semantic hurdle stands in the way of my determining that the towers are nontaxable personal property. To be exempt, the towers must be classified as “personal property affixed to the real property” and not “improvements.” A literal reading of the statute (N.J.S.A. 54:4-1) makes clear that “improvements” are always taxable and only “personal property so affixed [which] is machinery, apparatus, or equipment ...” under subsection (b), or which is not ordinarily intended to be permanently affixed to the real property and which can be removed without material injury to itself or to real property, under subsection (a), is exempt from real property taxation. This issue was not briefed or argued by the parties. In R.C. Maxwell, supra, 13 N.J.Tax at 527-28, this court stated that it was
... of the opinion that the resulting property constructed [a billboard] constitutes an “improvement thereon” and not personal property affixed to the real property, [citations omitted]. However, since the issue was not raised, briefed, or argued by the parties and by reason of my final conclusion the issue will not be finally determined here.”
[emphasis added]
In one of the two cases decided by this court under the Business Retention Act, Taylor v. Lower Tp., supra, the distinction between improvements and personal property so affixed was not addressed. Although this court addressed the issue in R.C. Maxwell, supra, it did not finally determine the issue, and in fact it did not have to do so in order to decide the case the way it did. I find that even if billboards are “improvements” they are factually distinguishable from radio towers.
Although some feel that the distinction between “improvements” and personal property affixed to real property in such a way or with such intent that it becomes taxable as real property is important, the parties who have the greatest interest in this case chose to ignore it. So would I. The parties have by their silence *523 on this issue agreed that the radio towers are not improvements.[2] I see no reason to disturb that silent agreement.
B.

The Wetlands

Plaintiffs wetland expert, Mr. Sadlon, testified that he had done a field survey of the subject property and had used the three traditional methods by which wetlands are delineated: the examination of hydrology, vegetation, and soils. Bergen County Assocs. v. East Rutherford, 12 N.J.Tax 399, 404 (Tax 1992). aff'd, 265 N.J.Super. 1, 625 A.2d 524 (App.Div.), certif. denied, 134 N.J. 482, 634 A.2d 528 (1993). He found that the vegetation almost throughout the property was phragmities, and thus, was not helpful in differentiating between uplands and wetlands. He then looked for what appeared to be wetland areas, and did successive borings with an auger radiating out from the central wet areas, until his examination indicated that the hydrology, i.e., water at the surface or within the upper reaches of the surface, and the specific soils associated with wetlands, indicated that the wetlands area ceased. He then placed flags at the outer limits of his wetland delineation. Subsequent to the placing of his flags a surveying firm was engaged which actually mapped the lines indicated by the flags. Then using a computer the survey firm measured the area enclosed within these wetlands. Five separate wetlands areas were mapped, indicating approximately 6.33 acres of this 22.58 acre parcel as being wetlands. Although testimony introduced at trial indicates that areas mapped by Mr. Sadlon may not have been found to be mapped as wetlands on any official Army Corps of Engineers, Coast and Geodetic Survey, or other maps, I find that there is no better way of determining wetlands *524 than an actual field survey. I find Mr. Sadlon to be an expert; and I find his testimony credible. Accordingly, I find that his delineation and mapping of the 6.33 acres of wetlands on the subject property is correct.
Defendant made much of the fact that the areas delineated by Mr. Sadlon were, for the most part, not included in any official mapping of wetlands by any of the many government agencies that are involved-in planning and have control over development in the Meadowlands. Assuming all of this to be true, it is not conclusive as to whether there are or are not wetlands in the subject property — it is only conclusive as to whether these wetlands appear on various maps. Thus, plaintiffs evidence as to wetlands, their delineation, and their size, is uncontroverted by any other witness or evidence which is reflective of an equally detailed examination of the subject property.
The ultimate determination of what are wetlands, and what may be developed, is a governmental decision which will be based on official designations, maps, and approvals. Such final delineation has not yet been accomplished with regard to the subject. Preliminary to those final delineations and approvals, the market must reflect what they are likely to be. I find that at this stage the actual mapping of Mr. Sadlon is a more accurate predictor of the ultimate conclusions, maps, and approvals, than are the preliminary crude maps offered by defendant. Furthermore, since my ultimate conclusion (see infra) is that the wetlands will contribute to the development of the subject and are to be valued in the same manner as uplands, the precise designation and qualification of wetlands has no effect on my ultimate conclusion of value. Only if the amount and location of the wetlands were significantly different from Mr. Sadlon’s conclusions would they significantly reduce the value which I have found.
C.

Valuation

Tax Court judges have expertise in tax matters. N.J.S.A. 2B:13-6(b); Ford Motor Co. v. Edison, 127 N.J. 290, 311, *525 604 A.2d 580 (1992). Nevertheless, we cannot go beyond the evidence and the data on the record in making a determination of value. FMC Stores v. Morris Plains, 100 N.J. 418, 430, 495 A.2d 1313 (1985). In this case two appraisal experts had radically different conclusions of value. Accordingly, it is essential that I make a finding as to which of the two valuation experts’ conclusions were more credible.
The municipal expert was the person responsible for the 1993 revaluation in East Rutherford. His ultimate conclusion of value is very close to the assessment based on the revaluation. Although he concluded that the highest and best use of the property was for sports and recreation development, he chose comparables that were zoned for other uses. He employed a valuation method, price per acre, at variance with the method he had used to value other developable property in other cases before this court, price per developable square foot of office space. Had he used that method in this case his conclusions would have been radically lower adjusted sales prices. He used as one of his comparables a property which had not sold and for which no sales contract was available. He used another small parcel which was purchased by a neighboring property owner to remove an eyesore. He used another parcel which was purchased by the Federal Reserve Bank with approvals for building a large facility. In short, his selection of comparable sales had one element in common, their price per acre was high.
Plaintiffs expert used comparable sales that were physically remote from the subject, and at least one that would not have qualified as a usable sale under the Director of the Division of Taxation’s SR 1A program used in determining the annual school aid ratios, NJ.S.A. 54:1-35.1. Whereas the selection of compara-bles by defendant’s expert appeared calculated to support his revaluation number, the selection by plaintiffs expert appeared to be calculated to support a value of approximately $5,000,000, (double the amount by which a 50% interest in the subject was sold in a sale between related parties that involved the discharge *526 of mortgages in excess of eight times the sale price and other unknown terms).
Admittedly, the subject parcel is unique. That being said, I find it hard to believe that two qualified experts really trying to establish true value rather than supporting their client’s adversarial positions would come to conclusions which differed in the final year under appeal by a factor in excess of five and one half (i.e., defendant’s expert’s ultimate conclusion of value for 1994 was five and one half times the conclusion of value of plaintiffs expert).
... I would like to make a brief comment with respect to expert witnesses. Too often an expert witness becomes an advocate for his clients. An expert’s job is to inform the court, not to be an advocate. That is the job of the lawyer. When the expert becomes an advocate, his credibility is seriously weakened and thus his effectiveness is severely hampered.
[United States Tax Court Judge Julian I. Jacobs, in a speech to the 49th Annual Conference of the Tax Executive Institute (October 23, 1994), Quoted in part at page 1 in the Tax Report, The Wall Street Journal, October 26, 1994.]
Having heard all of the testimony, I find that plaintiffs expert is more credible. By the preponderance of the evidence, plaintiff’s conclusions, with some adjustments, are closer to the truth than are defendant’s conclusions of value.
The plaintiffs expert, Mr. Blau, testified that the highest and best use of the subject property as improved is its current use as a radio station. He testified that the highest and best use as vacant is for future development. He further testified that, because of the soft market in the area, the time at which the property could be developed was uncertain. Plaintiffs expert,testified that future development was clearly the highest and best use. The nature of the development and the time in which it would take place was so speculative that it was appropriate to value the property as currently improved with radio station towers.
The defendant’s expert testified that the highest and best use of the subject was for development, although he did not indicate when that development would take place. His approach to value, since he used comparable properties which sold with approvals for development, indicates that his value conclusion as to highest and best use is based on immediate development. That is not com *527 pletely consistent with his testimony, which indicated that the property would be developed in the future. On cross-examination it was pointed out that in other cases in which this expert testified with regard to valuing properties which could be developed in the future he took a discount when using comparables which were currently developable. In this ease, no such discount was taken. Thus, the defendant’s expert’s final valuation of the property is for current development. Such a valuation is inconsistent with the testimony that development is only possible in the future.
In selecting comparable land sales plaintiffs expert chose large tracts which sold without approvals. These can be contrasted to the comparable sales of defendant’s valuation expert which were in general smaller, and came with significant approvals for current development.
The defendant presented four witnesses with expertise and experience in planning and operation of real estate in the Meadow-lands. None of them was a valuation expert and thus, they lacked the critical knowledge as to the economic feasibility of their grandiose plans for development of the subject property.
The defendant called a planning expert who is a regular consultant to the defendant municipality. He indicated that the municipality was a good client. He testified that the subject parcel could be developed as a jai-a-lai/fronton and dog track and perhaps as a theme park. Under article IV, section 7, paragraph 2 of the New Jersey Constitution and existing state statutes, it would be impossible to construct either a dog track or a jai-a-lai/fronton. Both types of establishments derive their value from wagering, betting, and gambling on the outcome of these “sports events”. The cited portion of the New Jersey Constitution forbids gambling unless specifically authorized by the Constitution. Neither of these activities is so authorized. The testimony was that the subject parcel was much too small for the construction of a theme park. In fact, the proposal to build a theme park in the vicinity of the subject parcel had come to naught. All of this leads me to conclude that the value of this expert’s testimony both as to the legal and physical possibilities of development of the property *528 before getting to their financial feasibility is virtually useless for this court’s determination of the value of the subject on the relevant assessing dates.
Similarly, the testimony of an entrepreneur who runs a fair on the adjoining Sports Authority property, although indicating that perhaps there are many uses of the subject, was not of sufficient precision and accuracy to help this court determine the value of the subject property.
In short, the non-valuation testimony of the defendant’s witnesses with regard to the potential development of the subject parcel, although interesting and imaginative, simply did not help this court. Apparently those individual’s conclusions played little or no role in the appraisal of defendant’s expert. Likewise, the testimony of those witnesses has no impact on this court’s ultimate conclusion of value.
Defendant’s planning expert testified that perhaps the best use of the property would be for development. He estimated that the size of the property under current common zoning within the Meadowlands would support an office building of approximately 320,000 square feet, which might be reduced to 240,000 square feet if the wetlands delineated by Mr. Sadlon were deducted from the developable square feet. Of course, no approvals were in place.
Based on that analysis of developable office space using the comparable sales that defendant’s valuation expert used in this case, evaluated on the basis of developable square feet of office space as opposed to a per acre value and using a discount which defendant’s appraisal expert had used in at least two prior cases in this court, plaintiff demonstrated that defendant’s analysis would lead to a conclusion of value of approximately $5,000,000. This value was substantially different from the conclusions of the defendant’s valuation expert in this case.
I completely reject the sale of a partial interest in the subject as giving any indication of its value. This conclusion is based on the fact that the sale occurred between related parties, that it was for only a partial (50%) interest, and no minority *529 discount was taken in applying that sale as a valuation indicator of the entire property. Further, it appeared that the stated price for the sale involved more than a simple sale of the subject property and included among other things the discharge of various mortgages which clearly included parcels other than the subject.
With regard to plaintiffs five comparable sales, other than sale number 1, the sale between an estate seller and a sophisticated developer-buyer, all four were physically remote from the subject. The most comparable sale used by plaintiffs expert was his sale number four in North Bergen, New Jersey, a 14.25 acre parcel for $4,046,000.
The parties have stipulated that the value of improvements in the Meadowlands did not change over the assessment period. Although plaintiffs expert testified as to a decline in land values over the assessment period, defendant’s expert testified that values of raw land in the Meadowlands were stable during the assessment period. On this single issue, the movement of land prices in the Meadowlands during the period 1990 to 1993, I find defendant’s expert’s testimony more credible than that of plaintiffs expert. Despite my general lack of confidence in defendant’s expert’s testimony in the case, his extensive experience in valuing Meadowlands property leads me to believe that he knows the movement of the market, even if I find that his selection of comparable sales was inconsistent with his conclusions of highest and best use. Accordingly, I have adjusted plaintiffs sale number four as follows: The sale price was $283,284 per acre. Plaintiffs expert adjusted it down 5% to deal with the physical characteristics of the property, and down 10% for the uncertainty of the zoning, for a total negative adjustment of 15%. Applying that 15% negative adjustment to $283,284 per acre results in a conclusion of value of $240,791 per acre which I have rounded to $240,800.
In Bergen County Assocs., supra, 12 N.J.Tax 399 the predominant nature of the property was wetlands. This court chose to value the wetlands and the uplands separately. In this case, I find that the wetlands constitute a significantly smaller portion of the total property and that though they eould not be *530 developed, they could be used for contribution to the development of the subject. Thus, the wetlands should be valued at the same rate as the upland property. Multiplying $240,800 per acre by 22.58 acres yields a total land value of the subject of $5,437,264.[3]
As indicated above, I have found that the building on the subject property and the concrete piers are taxable as real property and the parties have stipulated that the total value is $150,000 for the building and $440,000 for the piers for a total of $590,000. Thus, that amount should be added to the value of the land to come up with a total value of the subject property. Adding the value of the taxable improvements to the value of the land, it is my determination that the fair market value of the subject in each of the four years under appeal was $6,027,264.
III.
Since the assessments in each of the years 1991 and 1992 exceeds fair market value and the ratios under Chapter 123 are less than 100%, the applicable ratio in each year must be multiplied by the total fair market value to determine the total assessment in each year. N.J.S.A. 54:51A-6; see Passaic Street Realty v. Garfield, 13 N. J.Tax 482, 486 (Taxl993). Since the Chapter 123 ratio in 1994 exceeds 100% and 1993 is a revaluation year, the assessments for those years shall be the fair market value as determined by this Court. Accordingly, the total assessment for each year is as follows:
Fair Market Value x Ch 123 Ratio
1991 $3,252,900 ($6,027,300 x .5397)
*531 1992 $4,019,600 ($6,027,300 x .6669)
1993 $6,027,300
1994 $6,027,300
Pursuant to R. 8:9-3, the parties shall submit, within ten days, computations allocating these assessments among the parcels under appeal and as between land and improvements. If they cannot agree by that time, plaintiff shall move on notice to defendant under R. 8:9-4 and the applicable rules of court governing motions to allocate the assessments among the parcels and between land and improvements.

I note that although Mr. Levites testified that the towers were in use since 1968, Mr. Cheval testified that the bases were built in 1969 or 1970. Of course, this testimony is inconsistent. For purposes of the determination in this case I do not need to resolve this logical inconsistency.

I have found no New Jersey tax law which draws a distinction between improvements and personal property affixed to land in such a way that it cannot be removed without material injury to itself or the freehold or with the intention that it be permanent. Finding what that distinction is, if there is one, must be left for another case.

I note that in Bergen County Assocs., supra, this court found the value of the uplands in a nearby parcel based on a different record, to be $300,000 per acre. Were we to multiply that amount by 16.23 (22.58 total less 6.33 wetlands) the result would be $4,869,000. The record and evidence in another case are not conclusive or even persuasive as to the value in this case. But the fact that the two separate analyses lead to similar results regarding similar property gives confirmation that the magnitude of the conclusion is reasonable. See Bergen County Assocs. v. East Rutherford, 265 N.J.Super. 1, 4-5 n. 1, 625 A.2d 524 (App.Div.1993).